**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**UNIVERSITY HOSPITAL, STATE UNIVERSITY OF NEW YORK AT STONY BROOK, Defendant-Appellee,**

**Parents of Baby Jane Doe,
Intervenors-Defendants-Appellees.**

**No. 679, Docket 83–6343.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 2, 1983.

Decided Feb. 23, 1984.

Charles J. Cooper, Deputy Asst. Atty. Gen., Washington, D.C. (Wm. Bradford Reynolds, Asst. Atty. Gen., Edith S. Marshall, Daniel P. Butler, Attys., Dept. of Justice, Washington, D.C., Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for plaintiff-appellant.

Stanley A. Camhi, Asst. Atty. Gen., of the State of N.Y., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Dennis H. Allee, First Asst. Atty. Gen., Albany, N.Y., Melvyn R. Leventhal, Richard Rifkin, Deputy First Asst. Attys. Gen., Paul M. Glickman, Frederick K. Mehlman, Donna N. Miller, Martha O. Shoemaker, Asst. Attys. Gen., New York City, Sanford H. Levine, University Counsel and Vice Chancellor for Legal Affairs, Carolyn J. Pasley, Lewis E. Rosenthal, Staff University Counsel, Albany, N.Y., of counsel), for defendant-appellee.

James T. Reynolds, Hauppauge, N.Y. (Reynolds, Caronia & Gianelli, Hauppauge, N.Y., Charles M. Newell, Riverhead, N.Y., of counsel), for intervenor-defendant-appellee.

Steven R. Shapiro, Robert M. Levy, Arthur N. Eisenberg, New York City, for New York Civil Liberties Union as amicus curiae.

Richard L. Epstein, Chicago, Ill., Robert W. McCann, Linda A. Tomaselli, Chicago, Ill., Mark D. Morris, Albany, N.Y., Richard A. Noffke, Chicago, Ill. (William G. Kopit, Stuart M. Gerson, Robert P. Borsody, David H. Larry, Epstein Becker Borsody & Green, P.C., New York City, of counsel), for American Hosp. Ass'n, Hosp. Ass'n of New York State and American Medical Ass'n as amici curiae.

Stephan E. Lawton, Elizabeth B. Carder, Kevin R. Barry, Anne W. Weisman, Pierson, Ball & Dowd, Washington, D.C., for American Academy of Pediatrics as amicus curiae.

Timothy M. Cook, Western Law Center for the Handicapped, Los Angeles, Cal., Martin H. Gerry, Pickard & Gerry, Washington, D.C., Frank J. Laski, Thomas K. Gilhool, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for The American Coalition of Citizens With Disabilities, the Ass'n for Retarded Citizens, The Ass'n For The Severely Handicapped, Disabled In

Action of Metropolitan New York, and The Disabled Rights Union as amici curiae.

Before WINTER and PRATT, Circuit Judges, and METZNER, District Judge *.

GEORGE C. PRATT, Circuit Judge:

This expedited appeal presents the question whether Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Supp. V 1981), and one of its implementing regulations, 45 C.F.R. § 84.61 (1982) (incorporating 45 C.F.R. § 80.6(c) (1982)), authorize the United States Department of Health and Human Services (HHS) to obtain access to medical records maintained by defendant University Hospital concerning a seriously deformed newborn infant, identified only as Baby Jane Doe, whose parents have refused to consent to certain surgical procedures necessary to prolong the infant's life. The United States District Court for the Eastern District of New York (Leonard D. Wexler, *Judge)*, 575 F.Supp. 607, ruled that HHS was not entitled to the records and entered summary judgment in favor of University Hospital. For the reasons set forth below, we affirm.

I.

Baby Jane Doe was born on October 11, 1983 at St. Charles Hospital in Port Jefferson, New York. She was suffering from multiple birth defects, the most serious of which were myelomeningocele, commonly known as spina bifida, a condition in which the spinal cord and membranes that envelop it are exposed; microcephaly, an abnormally small head; and hydrocephalus, a condition characterized by an accumulation of fluid in the cranial vault. In addition, she exhibited a "weak face", which prevents the infant from closing her eyes or making a full suck with her tongue; a malformed brain stem; upper extremity spasticity; and a thumb entirely within her fist.

As a result of the spina bifida, the baby's rectal, bladder, leg, and sensory functions were impaired. Due to the combination of microcephaly and hydrocephalus, there was an extremely high risk that the child would be so severely retarded that she could never interact with her environment or with other people.

At the direction of the first pediatric neurosurgeon to examine her, the baby was immediately transferred to University Hospital for dual surgery to correct her spina bifida and hydrocephalus. Essentially, this would entail excising a sac of fluid and nerve endings on the spine and closing the opening, and implanting a shunt to relieve pressure caused by fluid build-up in the cranial cavity. The record indicates that these dual, corrective surgical procedures were likely to prolong the infant's life, but would not improve many of her handicapping conditions, including her anticipated mental retardation.

After consulting with several physicians, nurses, religious advisors, a social worker, and members of their family, the parents of the baby decided to forego the corrective surgery. Instead, they opted for a "conservative" medical treatment consisting of good nutrition, the administration of antibiotics, and the dressing of the baby's exposed spinal sac.

Litigation surrounding Baby Jane Doe began on October 16, when A. Lawrence Washburn, Jr., a Vermont attorney unrelated to the child and her family, commenced a proceeding in New York State Supreme Court seeking appointment of a guardian *ad litem* for the child and an order directing University Hospital to perform the corrective surgery. The court appointed William E. Weber as guardian *ad litem* and held an evidentiary hearing on October 19 and 20 to determine whether Baby Jane Doe was "in need of immediate surgical procedures to preserve her life". Following the hearing, at which University Hospital and the parents of the child were repre-

---

* Hon. Charles M. Metzner, of the United States District Court for the Southern District of New York, sitting by designation.

sented, the court concluded that surgery was necessary and ordered that it be performed.

One day later the Appellate Division of the New York Supreme Court reversed the decision of the trial court and dismissed the proceeding. The Appellate Division found that the "concededly concerned and loving parents have made an informed, intelligent, and reasonable determination based upon and supported by responsible medical authority." As the court elaborated:

The record confirms that the failure to perform the surgery will not place the infant in imminent danger of death, although surgery might significantly reduce the risk of infection. On the other hand, successful results could also be achieved with antibiotic therapy. Further, while the mortality rate is higher where conservative medical treatment is used, in this particular case the surgical procedures also involved a great risk of depriving the infant of what little function remains in her legs, and would also result in recurring urinary tract and possibly kidney infections, skin infections and edemas of the limbs.

Thus, the Appellate Division determined that the parents' decision was in the best interest of the infant and that there was, therefore, no basis for judicial intervention.

On October 28, the New York Court of Appeals affirmed the decision of the Appellate Division, relying on different grounds. Since the petitioner had no direct interest in or relationship to any party and had failed to contact the State Department of Social Services, which has primary responsibility under New York law for initiating child neglect proceedings, and since the trial court also had failed to seek that department's investigative assistance, the Court of Appeals found "no precedent or authority" for the proceeding. Accordingly, the Court of Appeals ruled that the trial court had abused its discretion by permitting the proceeding to go forward.

While the state court proceedings were still in progress, the federal government entered the picture. On October 19, HHS received a complaint from an unidentified "private citizen" that Baby Jane Doe was being discriminatorily denied medically indicated treatment on the basis of her handicaps. HHS referred the complaint to the New York State Child Protection Services, the state agency specifically responsible for investigating suspected incidents of child abuse, mistreatment, and neglect. On November 7, that agency concluded that there was no cause for state intervention.

Meanwhile, HHS obtained a copy of the record of the state court proceedings, which contained the child's medical records through October 19. The record was forwarded to and personally reviewed by the Surgeon General of the United States, who determined, among other things, that:

An appropriate determination concerning whether the current care of Infant Jane Doe is within the bounds of legitimate medical judgment, rather than based solely on a handicapping condition which is not a medical contraindication to surgical treatment, cannot be made without immediate access to, and careful review of, current medical records and other sources of information within the possession or control of the hospital.

Beginning on October 22, HHS repeatedly requested University Hospital to make available for inspection all of Baby Jane Doe's medical records since October 19. HHS based its authority to conduct an investigation on section 504 of the Rehabilitation Act, which provides in pertinent part that "[n]o otherwise qualified handicapped individual * * * shall, solely by reason of his handicap, * * * be subjected to discrimination under any program or activity receiving Federal financial assistance * * *". HHS further relied on 45 C.F.R. § 80.6(c), as incorporated by 45 C.F.R. § 84.61, which states:

(c) *Access to sources of information.* Each recipient [of Federal financial assistance] shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its fa-

cilities as may be pertinent to ascertain compliance with this part. * * * Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part. * *

University Hospital refused to honor HHS's requests, basing its decision in part on the refusal of the parents to release the records and in part on "serious concerns both as to the Department's jurisdiction and the procedures the Department has employed in initiating an inquiry."

The government then brought this action on November 2, alleging that University Hospital had violated section 504 and 45 C.F.R. § 80.6(c) by refusing to allow HHS access to information concerning the medical care and hospital services being rendered to Baby Jane Doe. After the parents had intervened as defendants, and after the district court had granted the government's request to expedite the proceedings, both the hospital and the parents moved to dismiss the complaint, arguing, among other things, that (1) congress did not intend section 504 to reach decisions regarding health care services provided to infants; (2) section 504 imposes no affirmative treatment obligations on the hospital beyond providing handicapped persons equal access to its facilities, which the hospital had done; (3) medicare and medicaid reimbursements do not constitute "Federal financial assistance" within the meaning of section 504; (4) Baby Jane Doe's medical records were protected from disclosure by both her and her parents' federal constitutional privacy rights; and (5) the failure of the federal government to intervene in the state court proceedings barred the instant action under the doctrine of laches. Among the papers submitted in support of these motions was the entire record of the state court proceedings.

The government cross-moved for summary judgment, contending that HHS was entitled to the requested records because (1) the hospital's neonatal unit was a "recipient" of "Federal financial assistance" in the form of medicaid and (2) under 45 C.F.R. § 80.6(c) any such "recipient" was required to allow HHS access to information necessary to the discharge of the agency's statutory obligation to insure compliance with section 504.

Following oral argument on November 17, during which the government conceded that it had found no evidence of discrimination in the records covering the period through October 19, the district court ruled that defendants were entitled to summary judgment. The court first rejected defendants' claims that (1) the suit was barred by laches; (2) access to the records was barred by New York's physician-patient evidentiary privilege; and (3) medicare and medicaid do not constitute "Federal financial assistance" within the meaning of section 504. Further, the court ruled that the entire hospital, not just its neonatal unit, was the "program or activity" covered by the statute.

Noting that 45 C.F.R. § 80.6(c) requires recipients of federal funds to provide HHS "access to such records 'as may be pertinent to ascertain compliance with'" section 504, the district court next reasoned that "if a recipient of federal financial assistance is clearly not violating [section 504] by discriminating against handicapped persons, the Department of Health and Human Services may not obtain access to the records of such recipient * * *". The court then turned to what it considered the central question: "whether, from the papers submitted to the Court, it can be clearly determined that the defendant University Hospital has not violated the statute by discriminating against a handicapped person." Emphasizing that the hospital "has at all times been willing to perform the surgical procedures in question", but "lacks the legal right to perform such procedures" in the absence of parental consent, the court concluded that the hospital "failed to perform the surgical procedures in question, not because Baby Jane Doe is handicapped, but because her parents have refused to consent to such procedures." Thus, in the court's view, "the failure of

the defendant University Hospital to perform the surgical procedures cannot possibly be regarded as a violation of the Rehabilitation Act."

In any case, the court went on, "the decision of the parents to refuse consent to the surgical procedures was a reasonable one based on due consideration of the medical options available and on a genuine concern for the best interests of the child." According to the court, this precluded any possibility of liability on the part of the hospital.

On appeal, the government, supported by various *amici*, argues that the district court erroneously required HHS "to make an advance evidentiary showing on the ultimate issue of unlawful conduct as a condition to securing the very materials necessary to reach a determination on that issue". In any event, the government contends, the district court's finding that no discrimination occurred could only have applied to the period up to October 19. Because "[m]edical decisionmaking is a dynamic process", the government claims that whatever the circumstances before October 19, the possibility remains that changes in the baby's conditions after that date would render the hospital's conduct discriminatory under section 504.

The government's principal argument, however, is that the district court erred in concluding that the parents' refusal to consent to surgery conclusively established the hospital's nondiscrimination and thus insulated the hospital from liability under section 504. In this regard, the government claims, for the first time on appeal, that the requested records were necessary to determine whether the failure of the hospital to seek a state court order overriding the parents' decision and compelling surgery was itself a violation of the nondiscrimination requirements of section 504.

Defendants, on the other hand, together with the various *amici* who support their position, not only defend the district court's decision on its own terms, but also argue that section 504 provides no authority for this action, because (1) medicare and medicaid do not constitute "Federal financial assistance" within the meaning of the statute and (2) congress did not intend that section 504 serve as the basis for federal intervention in medical decisionmaking. In addition, defendants renew their argument that access to the records is barred by New York's physician-patient privilege and the federal constitutional privacy rights of Baby Jane Doe and her parents. Finally, defendants argue that in light of the state court proceedings, this court should deny the federal government access to the records as a matter of equity, comity, and federalism.

## II.

As a preliminary matter, we briefly address the general standards governing a request by an investigating administrative agency such as HHS for the records of an institution such as University Hospital. An administrative agency is entitled to access to information "not plainly incompetent or irrelevant to any lawful purpose of the [agency] in the discharge of [its] duties". *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943); *see United States v. Morton Salt Co.*, 338 U.S. 632, 641–43, 70 S.Ct. 357, 363–64, 94 L.Ed. 401 (1950); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208–14, 66 S.Ct. 494, 505–08, 90 L.Ed. 614 (1946); *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1052–55 (2d Cir.1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); *see generally* 1 K. Davis, *Administrative Law Treatise* § 4.1 *et seq.* (2d ed. 1978). "So long as an agency establishes that an investigation 'will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within [its] possession, and that the administrative steps required * * * have been followed,' no showing of probable cause need be made to the district court unless a statute indicates otherwise." *SEC v. Wall Street Transcript Corp.*, 422 F.2d 1371, 1375 (2d Cir.) (citations omitted), *cert. denied*, 398 U.S.

958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970). Thus, if the district court meant what at one point it seemed to say—that the government was required to establish some evidence of unlawful discrimination as a condition to obtaining the requested records—it increased the burdens placed on the government by applicable precedents.

At the same time, however, and closer to the thrust of the district court's decision as we read it, an agency is not entitled to information sought in connection with an investigation that "overreaches the authority Congress has given". *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. at 217, 66 S.Ct. at 510. As we recognized in *United States v. Cabrini Medical Center*, 639 F.2d 908, 910 (2d Cir.1981), a case also involving section 504, there is "no point in permitting the Government to institute an investigation with its attendant inconvenience, expense, and annoyance if there is and can be no authority for undertaking it." These concerns are particularly acute in a case like the one at bar, where the demand for information arguably implicates constitutionally protected rights, *cf. Carey v. Population Services International*, 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977); *Whalen v. Roe*, 429 U.S. 589, 598–604, 97 S.Ct. 869, 875–879, 51 L.Ed.2d 64 (1977); *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965); *compare Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) *with Prince v. Massachusetts*, 321 U.S. 158, 164–71, 64 S.Ct. 438, 441–44, 88 L.Ed. 645 (1944), and also represents an unprecedented exercise of the agency's investigative powers. Under these circumstances, it is incumbent upon this court to exercise particular care in assuring itself that the subject matter of the investigation is within the agency's statutory jurisdiction. *Federal Election Commission v. Machinists Non-Partisan Political League*, 655 F.2d 380, 385–90 (D.C.Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Federal Election Commission v. Florida For Kennedy Committee*, 681 F.2d 1281, 1283–86 (11th Cir.1982).

Thus, while the philosophical, social, and ethical implications of this case may be far-reaching, the precise issue presented for our review is one of statutory construction: Did congress intend section 504 to reach the conduct HHS seeks to investigate? If the investigation is within the scope of section 504, then HHS is entitled to access to Baby Jane Doe's medical records (unless they are protected from disclosure by some statutory or constitutional provision). On the other hand, if the investigation is beyond the scope of section 504, then the district court properly denied access.

### III.

To focus more sharply on this central issue, it is first necessary to examine the theory upon which the government predicates its request for the records under section 504. The theory rests on two premises. First, the government draws a distinction between decisionmaking based on a "bona fide medical judgment", which without definition it concedes to be beyond the reach of section 504, and decisionmaking based solely on an individual's handicap, which it argues is covered by section 504. Second, the government identifies Baby Jane Doe's microcephaly, which the record indicates will result in severe mental retardation, as the handicapping condition. From these premises, the government reasons that if a newborn infant suffering from spina bifida and hydrocephalus, but not microcephaly, would receive treatment or services that differ from those provided to an infant suffering from all three defects, or alternatively, if the hospital would seek a state court order compelling surgery in the former case, but not in the latter, then a violation of section 504 would have been established. Without the requested records, the government concludes, it is impossible to determine whether any such unlawful discrimination has occurred here, at least after October 19.

### A.

In evaluating whether this theory entitles the government to the requested records, we initially assume, without deciding, that the district judge properly determined both that the hospital was a recipient of "Federal financial assistance" within the meaning of the statute, and that the "program or activity" to which the statute applies, if at all, is the entire hospital. Were we forced to confront these unsettled questions, *see United States v. Baylor University Medical Center,* 711 F.2d 38, 40 (5th Cir.1983), *staying* 564 F.Supp. 1495 (N.D.Tex.1983) ("[w]hether Medicare and Medicaid payments constitute federal financial assistance within the meaning of the Rehabilitation Act is a serious legal question that could have a broad impact upon federal/state relations"); *Grove City College v. Bell,* 687 F.2d 684, 700 (3d Cir. 1982) (under the "program or activity" limitation of Title IX of the Education Amendments of 1972, "[w]here the Federal government furnishes indirect or non-earmarked aid to an institution, * * * the institution itself must be the 'program'"), *cert. granted,* 459 U.S. 1199, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983), *argued* Nov. 29, 1983, *see* — U.S. ——, 104 S.Ct. 521, 78 L.Ed.2d 706 (1983), summary judgment could not properly be granted in favor of either side at this juncture. Far from being undisputed, many of the material facts bearing on those issues have simply not been developed in the record. For example, the record does not reveal the total amount of federal medicare and medicaid funds the hospital has received, directly or indirectly, or more importantly, how those funds are allocated among the various "programs" or "activities" that the hospital may conduct. Indeed, the record is devoid of evidence even as to how the hospital is organized, either internally or as part of a network of state-affiliated institutions.

In support of its position that the hospital's neonatal intensive care unit is the operative "program or activity" (a position which the district court did not adopt), the government did submit an affidavit of an HHS official asserting that University Hospital "received $5,317,912 (gross) in Medicaid reimbursement from October 1, 1982 to November 7, 1983 for one thousand eight hundred and nineteen (1,819) neo-natal billings. The Federal share of this amount is $2,250,285." However, this affidavit alone hardly affords a sufficient basis upon which to determine as a matter of law how the program-specificity requirement of section 504 should be applied here, particularly in light of the potential inconsistency, raised at oral argument, between the positions taken by the federal government in this case and in the *Grove City College* case currently pending in the Supreme Court. As both the opinion of the Third Circuit in *Grove City College,* 687 F.2d at 688–89 & nn. 6–9, and the brief submitted by the government to the Supreme Court in challenging that decision, Brief for Respondents at 3–5, *Grove City College v. Bell,* No. 82–792, aptly illustrate in the closely analogous context of Title IX, the issue of program-specificity cannot be properly analyzed in the abstract, but instead requires a concrete set of facts. The same is true with respect to the issue whether an institution that receives medicare or medicaid reimbursements is a recipient of "Federal financial assistance" within the meaning of section 504. *See Bernard B. v. Blue Cross and Blue Shield of Greater New York,* 528 F.Supp. 125, 132 (S.D.N.Y.1981), *aff'd,* 679 F.2d 7 (2d Cir.1982) (per curiam).

Given an understandable desire on both sides to resolve this dispute expeditiously, however, we are reluctant to remand the case to the district court for further factual development on these important issues. In the interest of justice, we shall therefore bypass them and proceed directly to the dispositive question whether, assuming the entire hospital is covered by section 504, the statute authorizes the type of investigation initiated here.

### B.

While the question whether section 504 authorizes HHS to investigate medical treatment decisions involving defective newborn infants is technically one of first

impression, we do not write on an entirely clean slate. The regulatory history of the statute reveals that the question has already received considerable attention.

In its original notice of intent to issue proposed rules under section 504, published in May 1976, HHS's predecessor, the Department of Health, Education and Welfare (HEW), requested comment on fifteen "critical issues", see 41 Fed.Reg. 29548, including "[w]hether a regulation should contain provisions concerning [institutionalized] patients' rights to receive or refuse treatment * * * ". 41 Fed.Reg. 20296 at 20297. Subsequently, in a July 1976 notice of proposed rulemaking, HEW indicated that it had received several comments urging "that the department did *not* have authority to regulate in this area" (emphasis added). 41 Fed.Reg. 29548 at 29559. HEW embraced this position, announcing that "[t]he Secretary is of the opinion that to promulgate rules on these subjects is beyond the authority of section 504." *Id.*

This limited view of the scope of section 504 was reflected in the first set of proposed regulations promulgated by HEW. The applicable provision, the proposed version of 45 C.F.R. § 84.52, emphasized the *"[a]vailability of services "* to handicapped persons and required that services be made "accessible" through use of methods such as "making house calls, referring patients, arranging to meet patients in accessible facilities, and modifying facilities." 41 Fed.Reg. at 29567 (emphasis in original).

Notwithstanding comments that its proposed health services regulation "lacks specificity", 42 Fed.Reg. at 22693, in its final section 504 regulations, issued in May 1977, HEW created a general "Health, welfare, and other social services" provision, 45 C.F.R. § 84.52, which emphasizes "the basic requirement of equal opportunity to receive benefits * * * ". 45 C.F.R., Part 84, Appendix A, ¶ 36. The agency did, however, also offer more specific guidance on the nature of the nondiscrimination requirement imposed by the regulation:

One common misconception about the regulation is that it would require spe-

cialized hospitals and other health care providers to treat all handicapped persons. The regulation makes no such requirement. Thus, a burn treatment center need not provide other types of medical treatment to handicapped persons unless it provides such medical services to nonhandicapped persons. It could not, however, refuse to treat the burns of a deaf person because of his or her deafness.

*Id.*

It was not until five years later that HHS first took the position that section 504 made it unlawful for hospitals receiving "Federal financial assistance" to withhold nutrition, or medical, or surgical treatment from handicapped infants if required to correct a life-threatening condition. *See American Academy of Pediatrics v. Heckler,* 561 F.Supp. 395, 397 (D.D.C.1983) (describing the circumstances leading to this shift in agency policy). This new position was reflected in a "notice * * * to remind affected parties of the applicability of section 504 of the Rehabilitation Act of 1973", dated May 18, 1982 and published on June 16, 1982. 47 Fed.Reg. 26027. In the notice, HHS "recognize[d] that recipients of Federal financial assistance may not have full control over the treatment of handicapped patients when, for instance, parental consent has been refused." *Id.* Nevertheless, referring to 45 C.F.R. § 84.4(b)(1)(v), which provides that a recipient may not aid or perpetuate discrimination by significantly assisting the discriminatory actions of another person, the notice admonished that:

• Counseling of parents should not discriminate by encouraging parents to make decisions which, if made by the health care provider, would be discriminatory under section 504.

• Health care providers should not aid a decision by the infant's parents or guardian to withhold treatment or nourishment discriminatorily by allowing the infant to remain in the institution.

*Id.*

Nearly a year after this notice was published, in March 1983, HHS issued an inter-

im final rule "to meet the exigent needs that can arise when a handicapped infant is discriminatorily denied food or other medical care." 48 Fed.Reg. 9630. This "novel and far-reaching" regulation, *American Academy of Pediatrics v. Heckler*, 561 F.Supp. at 397, would have required "each recipient that provides covered health services to infants" to display posters in conspicuous places "in each delivery ward, each maternity ward, each pediatric ward, and each nursery, including each intensive care nursery" declaring that "**DISCRIMINATORY FAILURE TO FEED AND CARE FOR HANDICAPPED INFANTS IN THIS FACILITY IS PROHIBITED BY FEDERAL LAW**". 48 Fed.Reg. at 9631, *amending* 45 C.F.R. § 84.61. The interim regulation also established a confidential "Handicapped Infant Hotline", "[a]vailable 24 hours a day", which *"[a]ny person having knowledge that a handicapped infant is being discriminatorily denied food or customary medical care should immediately contact"* (emphasis in original). *Id.* Further, the regulation stated that the required access to records "shall not be limited to normal business hours when, in the judgment of the responsible Department official, immediate access is necessary to protect the life or health of a handicapped individual." *Id.*

The preamble to the interim rule made clear that HHS believed it could conduct immediate investigations and make immediate referrals to the Department of Justice for appropriate legal action. 48 Fed.Reg. at 9631. However, without eschewing "a vigorous federal role in enforcing the federal civil rights at issue", it also indicated that "[t]he Secretary intends to rely heavily on the voluntary cooperation of State and local agencies, which are closest to the scene of violations, and which have traditionally played the key role in the investigation of complaints of child abuse and neglect." *Id.* at 9630.

On April 14, 1983, this interim final rule was struck down by the United States District Court for the District of Columbia. *American Academy of Pediatrics v. Heckler, supra.* In a thorough and informative opinion, Judge Gesell held that the regulation failed to satisfy the requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1982), in two respects. First, since the rulemaking record indicated the regulation was a product of "haste and inexperience", 561 F.Supp. at 400, and that many relevant factors, including the scope of section 504, were not considered, the court ruled that the interim final rule was arbitrary and capricious under 5 U.S.C. § 706(2)(A). As the court explained:

Government intervention into the difficult medical and human decisions that must be made in the delivery rooms and newborn intensive care units of our hospitals involves a profound change in the manner in which these decisions affecting the quality of life are made. Any intervention by an agency of the Federal Government should obviously reflect caution and sensitivity, given the present absence of a clear congressional directive.

561 F.Supp. at 403.

Second, the court ruled that the regulation was invalid due to the secretary's failure to follow the procedural requirements of 5 U.S.C. § 553(b) and (d). In this regard, Judge Gesell reasoned that the interim final rule could not properly be viewed as a restatement of preexisting law or policy, as the government had alleged:

As [HHS's] counsel acknowledged in argument, the regulation is intended, among other things, to change the course of medical decisionmaking in these cases by eliminating the parents' right to refuse to consent to life-sustaining treatment of their defective newborn. Moreover, the regulation provides for an intrusive on-premises enforcement mechanism that can be triggered by a simple anonymous call. Thus it clearly is more than a "clarification or explanation of an existing rule or statute" and affects substantive rights.

561 F.Supp. at 401 (footnote and citation omitted).

Following this decision, on July 5, 1983 HHS published a proposed rule in which the notice requirement was slightly revised, and a provision was added declaring that " * * * each recipient State child protective services agency shall establish and maintain written methods of administration and procedures to assure that the agency utilizes its full authority pursuant to State law to prevent instances of medical neglect of handicapped infants." 48 Fed.Reg. 30846 at 30851. In the appendix to the proposed rule, HHS listed several examples of decisions that would, in its view, constitute violations of section 504. These included:

> (3) Denial of treatment for medically correctable physical anomalies in children born with Spina Bifida, when such denial is based on anticipated mental impairment, paralysis, or incontinence of such child, rather than on reasonable medical judgments that treatment would be futile or too unlikely of success given complications in the particular case.

*Id.* at 30852.

More recently, on January 12, 1984, after oral argument of this appeal, HHS issued its "final rules on procedures and guidelines relating to nondiscrimination on the basis of handicap in connection with health care for handicapped infants." 49 Fed. Reg. 1622. These final rules modified the proposed rules in several major respects. *Id.* For example, HHS adopted the recommendation of several commenters that the federal government encourage, but not require, hospitals to establish Infant Care Review Committees "to assist the health care provider in the development of standards, policies and procedures for providing treatment to handicapped infants and in making decisions concerning medically beneficial treatment in specific cases." 45 C.F.R. § 84.55(a), 49 Fed.Reg. 1651; *see id.* at 1623–25. These committees are not, however, designed to be substitutes for mechanisms to enforce section 504. *Id.* at 1624.

Under the final rules, the notice requirement is also significantly modified. Among other things, the final rules require only that the notice be posted

> at location(s) where nurses and other medical professionals who are engaged in providing health care and related services to infants will see it. To the extent it does not impair accomplishment of the requirement that copies of the notice be posted where such personnel will see it, the notice need not be posted in area(s) where parents of infant patients will see it.

45 C.F.R. § 84.55(b)(2), 49 Fed.Reg. 1651.

In sum, the regulatory history of section 504 is inconclusive. HHS's current view of the scope of the statute is flatly at odds with the position originally taken by HEW. Notwithstanding HHS's claims to the contrary, *see* 49 Fed.Reg. at 1635, the current view also represents something of a retreat from the interpretation HHS adopted just last year. In determining whether congress intended section 504 to apply to treatment decisions involving defective newborn infants, we therefore lack the benefit of an administering agency's longstanding, consistent interpretation to which we otherwise might have looked for guidance. *See Frank Diehl Farms v. Secretary of Labor,* 696 F.2d 1325, 1329–31 (11th Cir.1983); *see also American Federation of Government Employees v. Federal Labor Relations Authority,* 712 F.2d 640, 643 n. 17 (D.C.Cir. 1983); *cf. United States v. Clark,* 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982); *see generally* 2 K. Davis, *Administrative Law Treatise* § 7.14 (2d ed. 1979).

### C.

■ With this unsettled regulatory background in mind, we turn to the statutory language, which is fundamental to any issue of statutory construction. *See North Haven Board of Education v. Bell,* 456 U.S. 512, 520, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982). Section 504 provides in pertinent part as follows:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Under 29 U.S.C. § 706(7)(B), "the term 'handicapped individual' means * * * any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

The initial inquiry is whether Baby Jane Doe is properly considered a "handicapped individual" within the meaning of section 706(7). The issue is not as simple as it first seems. While there can be no question that Baby Jane Doe currently suffers from "physical or mental impairments", *see* 45 C.F.R. § 84.3(j)(2)(i), it is less clear whether these impairments substantially limit "major life activities".

Defendants and some of the *amici* contend that the phrase "major life activities", undefined in the Rehabilitation Act, should be interpreted to exclude newborn infants from the coverage of section 504. In support, they rely on congress's declaration in section 122(a)(1) of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. No. 95–602, 92 Stat. 2984, codified at 29 U.S.C. § 701, that the purpose of the Rehabilitation Act "is to develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living." This purpose, they assert, is inapplicable to newborn infants, since: "By definition, such infants cannot be eligible for programs of employment, vocational rehabilitation or training. Indeed, no program of independent living can be seriously comprehended for any infant, let alone an infant who has a life-threatening disorder."

Further support for the view that section 504 does not apply to newborn infants can be found in the regulations HHS inherited from HEW. Under 45 C.F.R. § 84.-3(j)(2)(ii), " 'Major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." With or without corrective surgery, Baby Jane Doe's impairments unquestionably will substantially limit some of these functions in the future. However, the same cannot necessarily be said of the present, since newborn infants simply cannot perform many of these representative functions.

Notwithstanding this ambiguity in the phrase "major life activities", we hold that Baby Jane Doe falls within the definition of a "handicapped individual" in section 706(7)(B). The record indicates that Baby Jane Doe's rectal, bladder, leg, and sensory functions are all presently impaired. Further, the record suggests that, with or without corrective surgery, Baby Jane Doe will experience severe mental retardation for however long she lives. Absent any explicit indication in the statute or regulations that "major life activities" should be defined only with reference to adults, under these circumstances it would defy common sense to rule that she is not presently *regarded* as handicapped under section 706(7)(B)(iii).

Moreover, while congress may not have had handicapped children squarely in mind when it first formulated the definition of a "handicapped individual" in section 706(7)(B) in 1974, *see infra,* it has subsequently evinced its intent that such children receive at least some of the benefits of the Rehabilitation Act. In 1978, as part of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, congress authorized the Director of the Interagency Committee on Handicapped Research to make grants for research into "services for preschool age handicapped children." Pub.L. No. 95–602, § 111, 92 Stat. 2967, codified at 29 U.S.C. § 762(b)(11). The fact that congress recognized the needs of preschool age handicapped children in section 762(b)(11) undercuts defendants' argument that, since the declared purpose of the entire Rehabilitation Act set forth in section 701 focuses

on activities available only to adults, the "major life activities" referred to in section 706(7) should be similarly limited.

■ Having determined that Baby Jane Doe is a "handicapped individual" under section 706(7)(B), we next consider whether she possibly can be considered an "otherwise qualified" handicapped individual or to have been "subjected to discrimination" under section 504. These two issues are intertwined.

The leading cases construing the "otherwise qualified" criterion of section 504 have involved allegedly discriminatory denials of admission to certain educational programs. *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Doe v. New York University*, 666 F.2d 761 (2d Cir.1981). In that context, this court in *Doe v. New York University* recognized that:

> * * * it is now clear that [the phrase "otherwise qualified handicapped individual"] refers to a person who is qualified *in spite of* her handicap and that an institution is not required to disregard the disabilities of a handicapped applicant, provided the handicap is relevant to reasonable qualifications for acceptance, or to make substantial modifications in its reasonable standards or program to accommodate handicapped individuals but may take an applicant's handicap into consideration, along with all other relevant factors, in determining whether she is qualified for admission.

*Id.* at 775 (emphasis in original). *Cf.* 45 C.F.R. 84.3(k).

*Doe* establishes that section 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question. As defendants here point out, however, where medical treatment is at issue, it is typically the handicap itself that gives rise to, or at least contributes to, the need for services. Defendants thus argue, and with some force, that the "otherwise qualified" criterion of section 504 cannot be meaningfully applied to a medical treatment decision.

Similarly, defendants argue that it would be pointless to inquire whether a patient who was affected by a medical treatment decision was, "solely by reason of his handicap, * * * subjected to discrimination".

The government's answer to both these arguments is that Baby Jane Doe can be viewed as suffering from not one, but multiple handicaps. Indeed, the crux of the government's case is that her microcephaly is the operative handicap, and that the requested records are necessary to determine whether she has been discriminated against solely for that reason.

Despite its superficial logic, the government's theory is flawed in at least two respects. First, the government's view of "otherwise qualified" is divorced from the statutory language. As the mainstream of cases under section 504 exemplifies, the phrase "otherwise qualified" is geared toward relatively static programs or activities such as education, *e.g., Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980; *Doe v. New York University*, 666 F.2d 761, employment, *e.g., Prewitt v. United States Postal Service*, 662 F.2d 292 (5th Cir.1981); *Simon v. St. Louis County*, 497 F.Supp. 141, *aff'd in part, rev'd in part on other grounds*, 656 F.2d 316 (8th Cir.1981), *cert. denied*, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982), and transportation systems, *e.g., Dopico v. Goldschmidt*, 687 F.2d 644, 652–53 (2d Cir.1982). As a result, the phrase cannot be applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning. In common parlance, one would not ordinarily think of a newborn infant suffering from multiple birth defects as being "otherwise qualified" to have corrective surgery performed or to have a hospital initiate litigation seeking to override a decision against surgery by the infant's parents. If congress intended section 504 to apply in this manner, it chose strange language indeed. *See American Trucking Associations, Inc. v. United States*, 602 F.2d 444, 449–50 (D.C.Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420

(1979) (statutory language "should be given its plain, obvious and rational meaning").

■ Second, in arguing that Baby Jane may have been "subjected to discrimination" the government has taken an oversimplified view of the medical decisionmaking process. Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was "discriminatory". It is at this point that the analogy to race, relied on so heavily by the dissent, breaks down. Beyond the fact that no two cases are likely to be the same, it would invariably require lengthy litigation primarily involving conflicting expert testimony to determine whether a decision to treat, or not to treat, or to litigate or not to litigate, was based on a "bona fide medical judgment", however that phrase might be defined. Before ruling that congress intended to spawn this type of litigation under section 504, we would want more proof than is apparent from the face of the statute.

The legislative history, moreover, indicates that congress never contemplated that section 504 would apply to treatment decisions of this nature. The Rehabilitation Act of 1973, Pub.L. No. 93–112, 87 Stat. 355, was a comprehensive legislative package that was considered and passed by congress three times before it was finally signed into law by President Nixon. S.Rep. No. 318, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Ad. News 2076, 2086–90. Each version of the legislation approved by congress contained a provision prohibiting discrimination against the handicapped by federal grantees. *Id.* at 2078–82; *see Le Strange v. Consolidated Rail Corp.,* 687 F.2d 767, 772 (3d Cir. 1982), *cert. granted,* 459 U.S. 1199, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983), *argued* Nov. 29, 1983, *see* 52 U.S.L.W. 3393 (U.S. Nov. 22, 1983). However, this provision, which had been closely patterned after Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, *see* S.Rep. No. 1297, 93d Cong., 2d

Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 6373, 6390–91, was never a matter of controversy. Consequently, there is little discussion of it in the volumes of legislative history that were generated. *See Le Strange v. Consolidated Rail Corp., supra.*

The senate committee report that introduced the provision simply stated "[t]he bill further proclaims a policy of nondiscrimination against otherwise qualified handicapped individuals with respect to participation in or access to any program which is in receipt of Federal financial assistance." S.Rep. No. 1135, 92d Cong., 2d Sess. 49, *see* 118 Cong.Rec. 32294. Examples of programs that the provision was designed to cover that were identified on the floor of the senate included housing and employment. *See* 119 Cong.Rec. 5882 (remarks of Sen. Cranston).

Interestingly, the only consideration of medical issues that occurred in connection with the 1973 legislation did not involve the nondiscrimination provision that would eventually become section 504. In the first two versions of the legislation, congress had created several categorical programs to benefit target populations including those with end-stage renal disease and those with severe spinal cord injuries. In vetoing each of the first two versions of the Rehabilitation Act, President Nixon took issue with what he perceived to be congress's attempts to extend what was essentially a vocational program into the medical realm. *See* 118 Cong.Rec. 5880 (first veto memorandum); 119 Cong.Rec. 24570 (second veto memorandum). Ultimately, congress was forced to back down, *see* 119 Cong.Rec. 24566 (remarks of Sen. Cranston), and the final version of the 1973 legislation authorized research projects rather than categorical programs to benefit the target populations with which congress was concerned.

Since the primary purpose of the 1973 legislation was to extend and expand the 53-year old federal-state vocational rehabilitation program, it is not surprising that congress initially defined the phrase "hand-

**158**

icapped individual" in terms of employment:

> The term "handicapped individual" means any individual who (A) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (B) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services * * *.

Pub.L. No. 93–112, § 7(6), 87 Stat. 355, 361.

However, because "[i]t was clearly the intent of the Congress in adopting section 503 (affirmative action) and section 504 (nondiscrimination) that the term 'handicapped individual' in those sections was not to be narrowly limited to employment (in the case of section 504), nor to the individual's potential benefit from vocational rehabilitation services under titles I and III (in the case of both sections 503 and 504) of the Act", S.Rep. No. 1297, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 6373, 6388, congress expanded the definition to its current version, focusing on "major life activities", in the Rehabilitation Act Amendments of 1974, Pub.L. No. 93–516, § 111(a), 88 Stat. 1619. As the senate report accompanying the 1974 amendments elaborated:

> Thus, it was not intended that an employer-government contractor should condition its hiring of handicapped individuals under an affirmative action plan on such individuals' having benefitted, or having a reasonable expectation of benefitting, from vocational rehabilitation services. Similarly, a test of discrimination against a handicapped individual under section 504 should not be couched either in terms of whether such individual's disability is a handicap to employment, or whether such individual can reasonably be expected to benefit, in terms of employment, from vocational rehabilitation services. Such a test is irrelevant to the many forms of potential discrimination covered by section 504.

> Section 504 was enacted to prevent discrimination against all handicapped individuals, regardless of their need for, or ability to benefit from, vocational rehabilitation services, in relation to Federal assistance in employment, housing, transportation, education, health services, or any other Federally-aided programs. Examples of handicapped individuals who may suffer discrimination in receipt of Federally-assisted services but who may have been unintentionally excluded from the protection of section 504 by the references to enhanced employability in section 7(6) are as follows: physically or mentally handicapped children who may be denied admission to Federally-supported school systems on the basis of their handicap; handicapped persons who may be denied admission to Federally-assisted nursing homes on the basis of their handicap; those persons whose handicap is so severe that employment is not feasible but who may be denied the benefits of a wide range of Federal programs; and those persons whose vocational rehabilitation is complete but who may nevertheless be discriminated against in certain Federally-assisted activities.

S.Rep. No. 1297, *supra* at 6388–89.

This passage provides the best clue to congressional intent regarding section 504's coverage of "health services". As Judge Gesell noted in *American Academy of Pediatrics v. Heckler*, 561 F.Supp. at 401:

> The legislative history * * * [on this subject] focuses on discrimination against adults and older children and denial of access to federal programs. As far as can be determined, no congressional committee or member of the House or Senate ever even suggested that section 504 would be used to monitor medical treatment of defective newborn infants or establish standards for preserving a particular quality of life. No medical group appeared alert to the intrusion into medical practice which some doctors apprehend from such an undertaking, nor were representatives of parents or spokesmen for religious beliefs that would be affected heard.

The post-enactment legislative history also indicates both that congress was primarily concerned with affording the handicapped access to federally-funded programs and activities, and that congress never envisioned that HEW (or HHS) would attempt to apply section 504 to treatment decisions. On April 28, 1977, the day the original set of final section 504 regulations were promulgated by HEW, then Secretary Califano sent congress an explanatory letter. After observing that the regulation "calls for dramatic changes in the actions and attitudes of institutions and individuals who are recipients of HEW funds", and "opens a new era of civil rights in America", Secretary Califano stated that "[i]n light of the limited legislative history, I think it especially important that Congress evaluate the regulation, and the implementation process, to ensure that they conform to the will of Congress." (letter reprinted in Hearings Before the Subcommittee on Select Education of the Committee on Education and Labor of the House of Representatives, 95th Cong., 1st Sess. 76 (hereinafter referred to as "Oversight Hearings")).

Thereafter, the House Subcommittee on Select Education conducted oversight hearings on the section 504 regulations in September 1977. During these hearings, the subcommittee heard testimony covering a wide range of topics from witnesses representing the federal government, state governments, education agencies, and organizations · serving handicapped people. Throughout the hearings, the issue of program accessibility was a recurrent theme. *See* Oversight Hearings at 1 (remarks of Congressman Brademas) ("Central to the implementation of these regulations must be the realization that what handicapped people want is access to programs"); 36–37 (remarks of Thomas P. Carroll); 246 (remarks of Debbie Kaplan); 248 (remarks of Ralph Hotchkiss); 295, 358–59, 361 (remarks of David S. Tatel).

On the other hand, although several witnesses echoed Secretary Califano's remark that the newly-issued regulations ushered in a "new era" of civil rights for handicapped citizens, *see* Oversight Hearings at 31 (remarks of Thomas P. Carroll); 337 (remarks of David S. Tatel), and another observed that "many are the issues which cry out for resolution", *id.* at 217 (remarks of James Gashel), at no point did any witness even remotely suggest that section 504 could or would be applied to treatment decisions involving defective newborn infants. Instead, those witnesses who addressed the legal, as opposed to the fiscal, issues raised by HEW's section 504 regulations, including the director of HEW's Office of Civil Rights (OCR), David S. Tatel, *see id.* at 290–368, focused on subjects such as OCR's complaint backlog, *id.* at 218–20 (remarks of James Gashel), and whether attorneys' fees should be made available in private enforcement actions. *Id.* at 2125 (remarks of Frank G. Bower); 245 (remarks of Debbie Kaplan); 257–63 (remarks of Daniel Yohalem).

We are aware, of course, that "[w]here the words and purpose of a statute plainly apply to a particular situation, * * * the fact that the specific application of the statute never occurred to Congress does not bar us from holding that the situation falls within the statute's coverage." *United States v. Jones*, 607 F.2d 269, 273 (9th Cir.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1043, 62 L.Ed.2d 771 (1980); *see Affetto v. TRW, Inc.*, 691 F.2d 357, 362 (7th Cir.1982); *United States v. Bates*, 617 F.2d 585, 587 n. 7 (10th Cir.1980); *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 380 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *see also Jefferson County Pharmaceutical Association, Inc. v. Abbott Laboratories*, 460 U.S. 150, 103 S.Ct. 1011, 1017 n. 18, 74 L.Ed.2d 882 (citing cases). Here, however, the government's theory not only strains the statutory language but also goes well beyond congress's overriding concern with guaranteeing handicapped individuals access to programs or activities receiving federal financial assistance. Further, the situation in question is dramatically different in kind, not just in degree, from the applications of section 504 dis-

cussed in the legislative history. Under these circumstances, the failure of congress to focus on treatment decisions involving defective newborn infants strikes a telling blow to the government's position.

This void in the legislative history is conspicuous for another reason. Prior to the enactment of the Rehabilitation Act, congress had passed a number of measures limiting federal involvement in medical treatment decisions. For example, the very first section of the medicare law, first enacted in 1965, Pub.L. No. 89–97, § 102(a), 79 Stat. 291, codified at 42 U.S.C. § 1395, ironically one of the laws under which the government purports to exercise jurisdiction in this case, provides that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided * * * ". Similarly, when it enacted the Professional Standards Review Organization (PSRO) provisions of the Social Security Act in 1972, Pub.L. No. 92–603, § 249F(b), 86 Stat. 1429, codified at 42 U.S.C. § 1320c *et seq.*, congress reiterated its view that determinations regarding the quality and appropriateness of medical treatment should not be undertaken by federal officials. *See* S.Rep. No. 1230, 92nd Cong., 2d Sess. 256–58 (1972); *see also Public Citizen Health Research Group v. HEW*, 668 F.2d 537, 542 (D.C.Cir.1981).

In view of this consistent congressional policy against the involvement of federal personnel in medical treatment decisions, we cannot presume that congress intended to repeal its earlier announcements in the absence of clear evidence of congressional intent to do so. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189–93, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978) (citing cases). As has already been seen there is no such clear expression of congressional intent in either the language or legislative history of section 504.

Along the same lines, we cannot presume that by enacting section 504, congress intended the federal government to enter the field of child care, which, as HHS has recently acknowledged, has traditionally been occupied by the states. *See* 49 Fed. Reg. 1626–27, 1629–31; 48 Fed.Reg. 9630. Had congress intended to displace state police power functions, it surely would have made that intention explicit.

Finally, case law construing section 504, while not directly on point, also suggests that the government's new interpretation of the statute exceeds the authority conferred by congress. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court emphasized that "[t]he language and structure of the Rehabilitation Act of 1973 reflect the recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps." *Id.* at 410, 99 S.Ct. at 2369. The Court concluded that "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds." *Id.* at 411, 99 S.Ct. at 2370. *See American Public Transit Association v. Lewis*, 655 F.2d 1272 (D.C.Cir.1981), *cf. Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir.1982).

In the present case, Baby Jane Doe has been treated in an evenhanded manner at least to the extent that the hospital has always been and remains willing to perform the dual, corrective surgeries if her parents would consent. Requiring the hospital either to undertake surgery notwithstanding the parents' decision or alternatively, to petition the state court to override the parents' decision, would impose a particularly onerous affirmative action burden upon the hospital. *Cf. American Academy of Pediatrics v. Heckler*, 561 F.Supp. at 402 ("section 504 was never intended by Congress to be applied blindly and without any consideration of the burdens and intrusions that might result").

## IV.

■ We have been called upon on this appeal "to determine the applicability of a

statute where the language of the statute does not make crystal clear its intended scope." *Allen v. State Board of Elections,* 393 U.S. 544, 570, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969). As the Supreme Court stated in *Allen,* "[i]n all such cases we are compelled to resort to the legislative history to determine whether, in light of the articulated purposes of the legislation, Congress intended that the statute apply to the particular case[ ] in question." *Id; see Montana Power Co. v. Federal Power Commission,* 445 F.2d 739, 746 (D.C.Cir. 1970) (*en banc*), *cert. denied,* 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971). Our review of the legislative history has shown that congress never contemplated that section 504 of the Rehabilitation Act would apply to treatment decisions involving defective newborn infants when the statute was enacted in 1973, when it was amended in 1974, or at any subsequent time. Further, neither the articulated purposes of the statute, which concern access and admission to federally-funded programs and activities for otherwise qualified handicapped individuals, nor any fair and reasonable projections of those purposes, *see Montana Power Co. v. Federal Power Commission, supra,* nor the applicable case law interpreting the statute, support the far-reaching position advanced by the government in this case.

"[G]iven the present absence of a clear congressional directive", *American Academy of Pediatrics v. Heckler,* 561 F.Supp. at 403, we agree with Judge Gesell that "[a]ny intervention by an agency of the Federal Government should obviously reflect caution and sensitivity". *Id.* We go one step further, however, and hold that under these circumstances it is congress, rather than an executive agency, that must weigh the competing interests at stake in this context in the first instance. Until congress has spoken, it would be an unwarranted exercise of judicial power to approve the type of investigation that has precipitated this lawsuit.

The judgment of the district court is therefore affirmed.

WINTER, Circuit Judge, dissenting:

Since I believe that Section 504 applies to the provision of medical services to handicapped infants, I respectfully dissent. I would reverse and remand for further consideration of whether the kinds of federal financial assistance received by the defendant hospital subject the hospital to the commands of Section 504 in the case of the infant in question.

I

Section 504 provides that

[n]o otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

29 U.S.C. § 794. It thus states with as much clarity as is reasonably possible that in some circumstances recipients of federal financial assistance may not differentiate between individuals on grounds that one or more is handicapped. The only ambiguity relevant to the present case, I respectfully suggest, is whether the hospital is such a recipient with regard to its obligations to Baby Jane Doe and not whether Section 504 includes the provision of medical services to handicapped infants.

Although modern courts frequently rely upon legislative history to reach results at odds with the seemingly plain language of a statute, only the most compelling reasons should induce a court to override statutory language because the legislative history is silent on a particular point. Such compelling circumstances might exist in the present case if Congress had no reason to address the questions at hand when it enacted Section 504. It hardly needs stating that the underlying issues brim with political and moral controversy and portend to extend the hand of the federal government into matters traditionally governed by an interaction of parental judgment and state authority. Were I able to conclude that Congress had no reason to address these

issues in its consideration of Section 504, I would concur with the majority on the grounds that specific consideration by the Congress of this political and moral minefield would be appropriate before applying the statute as written.

However, such a conclusion is untenable since Section 504 is no first step into a hitherto uncharted legal wilderness. As the Senate Report stated:

Section 504 was patterned after, and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap.

S.Rep. No. 1297, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 6373, 6390. Section 504 was thus enacted against a background of well understood law which was explicitly designated as a guide to interpretation. Congress was persuaded that a handicapped condition is analogous to race and that, so far as the administration of federal financial assistance is concerned, discrimination on the basis of a handicap should be on statutory par with discrimination on the basis of race.

Once Section 504's legislative heritage is acknowledged, the "void" in the legislative history is eliminated and the many issues raised by defendants with regard to medical decisions, parental judgments and state authority simply evaporate. The government has never taken the position that it is entitled to override a medical judgment. Its position rather is that it is entitled under Section 504 to inquire whether a judgment in question is a *bona fide* medical judgment. While the majority professes uncertainty as to what that means, application of the analogy to race eliminates all doubt. A judgment not to perform certain surgery because a person is black is not a *bona fide* medical judgment. So too, a decision not to correct a life threatening digestive problem because an infant has Down's Syndrome is not a *bona fide* medical judgment. The issue of parental authority is also quickly disposed of. A denial of medical treatment to an infant because the infant is black is not legitimated by parental consent. Finally, once the legislative analogy to race is acknowledged, the intrusion on state authority becomes insignificant.

The logic of the government's position on these aspects of the case is thus about as flawless as a legal argument can be. Any doubt must stem not from a deficiency in the argument based on the analogy to Title VI of the Civil Rights Act but from a disagreement as to whether a handicapped condition is fully analogous to race. *See American Academy of Pediatrics v. Heckler,* 561 F.Supp. 395, 402 (D.D.C.1983). Whether that doubt is justified or not, however, courts are not the proper fora in which the reasonableness of the analogy to race is to be judged.

Selective refusals to be guided by precedents under Title VI of the Civil Rights Act are likely to lead to an incoherent body of interpretative law under Section 504. Ambiguity pervades the majority opinion as to exactly which services and which handicapped persons are excluded from the statute. All one can know for certain is that some medical services may be denied to some handicapped persons, without running afoul of Section 504. The majority even implies, *inter alia,* that Section 504 may not apply at all to the provision of medical services, since such services are inseparable from treatment decisions. This is in the face of the explicit statement of the Senate Report that it "was enacted to prevent discrimination against all handicapped individuals … in … health services," S.Rep. No. 1297, *supra, reprinted in* 1974 U.S.Code Cong. & Ad.News at 6388. If that interpretation stands, the handicapped will be deprived of a fairly won political victory and exposed to the possibil-

ity of future decisions excluding other services from coverage by Section 504. On the other hand, the majority opinion also implies that a narrower holding may be intended and that only certain kinds of handicapped persons are excluded. If that interpretation stands, then the federal courts may be forced to resolve individually each of these human tragedies and moral dilemmas. It was Judge Gesell's prediction in *American Academy of Pediatrics,* the precedent drawn upon so heavily by the majority, that Section 504 will require line-drawing in individual cases between the extremes of a failure to provide services to a mildly handicapped child and a failure to use heroic measures to prolong for a period of time the life of an infant who has no hope of achieving even minimal consciousness. 561 F.Supp. at 402. Such a reading of Section 504, however, intrudes quite as profoundly upon medical decisions, parental judgments and state authority as the interpretation proffered by the government and thus undermines the reasoning of the majority.

Also, I would respectfully suggest that we act outside our legitimate area of authority in declining to follow the path staked out by Title VI of the Civil Rights Act. Congress did not adopt the analogy to race merely as a legislative means to a policy goal but was persuaded and politically energized by the view that the analogy was correct. A judicial failure to follow the analogy where it leads is an outright disagreement with Congress' judgment and an unconstitutional act in itself.

Finally, we facilitate the democratic legislative process by applying the analogy to race as adopted by the Congress. A political temptation to avoid confrontations with issues of moral or prudential controversy is an inevitable aspect of legislative deliberations. If courts are perceived as ready to "correct" overbroad legislation, Congress will find it ever more tempting to avoid its responsibility to address and resolve the highly delicate issues which may lurk in seemingly unobjectionable legislative proposals. Rhetorical flourishes will be substituted for statutory precision and "voids" in legislative histories will be ever more frequent. This is particularly so in cases involving legislative analogies to race. The moral and legal successes of the civil rights movement have prompted many groups to seek legislation which puts a particular characteristic or condition on a legal par with race. So long as the courts are perceived to stand ready to consider tempering such legislation where it leads to controversial results, the path of least political resistance will always be for the Congress to avoid serious consideration of the actual consequences of legislating particular analogies to race. Only an apprehension that such legislative analogies will be enforced by courts as written can provide a counter incentive to induce Congress to address its legislative responsibilities.

II

I agree with that portion of the discussion in Part II A of Judge Pratt's opinion which concludes that we cannot determine on the present record whether the defendant hospital is a recipient of "financial federal assistance" within the meaning of Section 504 and whether the "program or activity" to which that section applies is the entire hospital. I would, therefore, reverse and remand so that the record can be amplified. In light of the pendency of *Grove City College v. Bell,* 687 F.2d 684 (3rd Cir.1982) *cert. granted* — U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983) argued Nov. 29, 1983, *see* — U.S. ——, 104 S.Ct. 521, 78 L.Ed.2d 706 (1983) and in view of the majority's decision, further discussion of this issue by me would be superfluous.

For the reasons stated above, I dissent.