**Mary Ann GERBEN, on her own behalf and as Administratrix of the Estate of Erika Gerben, and Jonathan Gerben**

v.

**Douglas S. HOLSCLAW, Jr., M.D., Jeffrey Sussman, M.D. and Hahnemann University Hospital.**

**Civ. A. No. 88–1520.**

United States District Court, E.D. Pennsylvania.

Aug. 3, 1988.

Edmond A. Tiryak, Philadelphia, Pa., for plaintiffs.

James M. Penny, Jr., Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for defendant Douglas S. Holsclaw, Jr., M.D.

Richard A. Kolb, White & Williams, Philadelphia, Pa., for defendant Hahnemann University Hosp.

## OPINION OF THE COURT [*]

LOUIS H. POLLAK, District Judge.

What is before us this morning is a pair of motions to dismiss the complaint, motions submitted by the individual defendant Douglas Holsclaw and the institutional defendant Hahnemann Hospital. The third defendant, also an individual, Sussman, has not been served and so does not figure in the activities today.

The suit before the Court is one brought by Mary Ann Gerben and Jonathan Gerben, the parents of an infant, Erika Gerben, who sadly was born afflicted with cystic fibrosis, and with substantial complications attendant to that. The subject of the litiga-

tion arises out of her brief and difficult fight. She was born in April of 1986, and died after a hospital life first at Jefferson, and within a few weeks after her birth, at Hahnemann. She died in April of 1987.

The essence of the controversy is that, as alleged in the complaint, the defendant Hahnemann, and Hahnemann's two attending physicians, Dr. Holsclaw and his assistant Dr. Sussman, pursued with respect to Erika Gerben a course of aggressive and persistent care intended to perpetuate her life as long as possible, notwithstanding that it was apparent to the physicians (and the parents were so advised within a few months of Erika's birth) that she had only a very few months to live, at the longest.

In the face of that prognosis, so the complaint tells us, the defendant doctors sought to pursue a protocol under which they would "take each and every treatment step possible to maximize the number of days, hours and minutes that Erika lived, regardless of the amount of pain and suffering such treatment caused her." Complaint ¶ 23.

Erika's family, by contrast, "was guided by the belief that Erika's best interests would be served through managing her death through less painful and intrusive treatment methods, and were more concerned that the remaining few days and weeks of her life be as comfortable as possible, even if such a course of treatment reduced the number of days that Erika actually lived." Complaint ¶ 24.

Against that background, so the complaint says in paragraph 27, "when disagreements arose as to the best modality of care and treatment for Erika, defendants Holsclaw and Sussman developed a policy and practice of:

(i) failing to advise the Gerben family of the nature, purpose and extent of treatments provided to Erika;

(ii) failing to obtain the consent of the Gerben family for treatments which they sought to implement but which they knew

[*] This Bench Opinion was delivered August 3, 1988. Minor editorial changes have been made to enhance intelligibility.

would not be agreed to by the Gerben family; and

(iii) refusing to cease painful and intrusive treatment methods even after being advised by the Gerben family that such treatment was not consented to nor desired by the Gerben family."

In paragraph 29 of the complaint, there is a recital of certain of the treatment methods allegedly pursued by the defendants Holsclaw and Sussman under the policy and practice described in paragraph 27. The included "repeatedly forcing hypodermic needles through Erika's abdomen without any anesthetic in order to obtain a sterile sample of her urine, when such a sample had minimal treatment value in the context of Erika's life; refusing to permit Erika to have Tylenol for discomfort, despite the fact that she had literally worn the hair off the back of her head while crying in pain," and other procedures and medications, such as repetitive withdrawals of blood for blood samples and repetitive insertions of intravenous tubes under circumstances leading to the collapse of the affected veins and to the infliction of substantial pain. Also identified was the administration of steroids "for the purpose of prolonging Erika's life, when such medication had significant side effects."

The complaint alleges that the Gerben family, aware of the refusal of the defendants Holsclaw and Sussman to comport with the more moderate regimens that the Gerbens thought appropriate, complained to the hospital administrator and other hospital officials, but "none of those bodies took any steps to assist them in this dispute, thereby in effect ratifying the actions of the defendant doctors."

On the basis of this factual recital, Mr. and Mrs. Gerben have brought suit in this court alleging two sorts of cause of action. The one which is asserted to give to this court jurisdiction over the case is a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which proscribes discrimination on the basis of a handicap by institutions—of which Hahnemann is acknowledged to be one for the purposes of this motion—receiving federal assistance.

In addition to the Section 504 claim, the complaint (which is not subdivided into separate counts) asserts conclusorily that "[i]n performing the above described actions, defendants have violated plaintiff's rights under der Pennsylvania law, including that of assault and battery."

What is sought by the complaint is a declaration that the defendants have violated plaintiffs' rights under federal and state law. Also sought are an award of compensatory and punitive damages and attorneys' fees.

I have noted that the plaintiffs are Mary Ann Gerben and Jonathan Gerben, although the complaint does not distinguish between the two plaintiffs except in the sense that it identifies Mrs. Gerben as, in addition to being the mother of Erika, the administrator of Erika's estate. The plaintiffs' memorandum in opposition to the motion to dismiss takes the ground that with respect to the federal claim, that is the Section 504 claim, Mary Ann Gerben as administratrix is the plaintiff, and thus it would appear that if the federal claim is found viable, Jonathan Gerben is not to be deemed a party plaintiff as to that claim. So Jonathan Gerben, as the infant's father, is evidently regarded as an appropriate plaintiff, along with Mary Ann Gerben, as mother and administratrix, with respect to the allegedly pendent state law claim or claims.

The question for decision is whether the complaint states a cognizable claim under Section 504 of the Rehabilitation Act. The Rehabilitation Act provides in pertinent part: "No otherwise qualified individual with handicaps in the United States, as defined in Section 706(8) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794.

The allegation of discrimination in this case rests on a paragraph of the complaint which I have not yet read; that paragraph is paragraph 28. After referring in paragraph 27 to the policy and practice alleg-

edly developed by the defendants Holsclaw and Sussman of failing to advise the Gerbens of the nature of the proposed treatments, failing to obtain the Gerben family's consents for such treatments (knowing that they would not be agreed to), and refusing to cease painful and intrusive treatment even after being advised that such treatment was not consented to, paragraph 28 goes on to say: "Defendant doctors would not have adopted these policies and practices [had] Erika been a conscious adult able to speak for herself. Thus their actions constituted a difference in treatment as a result of her *handicap*." The handicap in short—that is referred to in the sentence just quoted, "Thus, their actions constituted a difference in treatment as a result of her handicap"—is the handicap of not being a "conscious adult."

As developed in argument this morning on the motions, plaintiffs' counsel made plain that it was the incompetence to communicate and speak for herself, to react, and to convey feelings and preferences of the infant Erika, which is the handicap on the basis of which the defendants Holsclaw and Sussman are alleged in paragraph 27 to have developed the policy and practice of treatment which has been described.

Plaintiffs' complaint, therefore, is not that Erika was singled out for more persistent and more painful and unconsented-to procedures for the reason that she had cystic fibrosis, but rather that she was, as distinct from a "conscious adult," one who was unable to speak for herself and one whose preferences, as registered through the medium of her parents, were disregarded for the reason that Erika was not a "conscious adult."

The elucidation of Section 504 depends, of course, on the definition of what the term individual with handicaps means in the phrase, "No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

The pertinent statutory definition to be found in 29 U.S.C. § 706(8)(B) is as follows: "Subject to the second sentence of this subparagraph, the term 'individual with handicaps' means, for purposes of subchapters IV and V of this chapter, any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." The second sentence of the subparagraph is not pertinent for purposes of this case.

In moving to dismiss, defendants have come close to contending that Section 504 does not address questions of the medical treatment of infants with birth defects, such as cystic fibrosis, in the covered hospitals. The decided cases up to now certainly reflect a very strong judicial hesitancy about entering that area of medical decision-making.

The principal cases are the Second Circuit's decision in *United States v. University Hospital*, 729 F.2d 144 (1984), and the Supreme Court's decision in *Bowen v. American Hospital Ass'n*, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). Those cases reflect efforts taken by the current administration through the Department of Health and Human Services to monitor the treatment by covered hospitals of infants with birth defects.

The case in the Second Circuit, the *University Hospital* case, was a rebuff to those administration efforts, when the Department of Health and Human Services sought to compel the production of information with respect to instances of hospital treatment relating to children with birth defects, most particularly in circumstances in which there was ground for supposing that hospital officials, acting in consonance with parental wishes, did not pursue life-sustaining measures for these very severely ailing infants.

The later Supreme Court decision, *Bowen v. American Hospital Ass'n*, dealt with certain regulations adopted by the Secretary of Health and Humans Services.

Those regulations would have provided a framework for required reportage by hospitals to state supervisory agencies, and would have imposed on state agencies a set of obligations of superintendence of federally financed hospitals to make sure that those hospitals were indeed conforming with the non-discrimination mandate of the statute.

The *Bowen* case, decided by a five-to-three margin—one member of the Court not participating, and one of the five majority Justices not joining the plurality opinion by Justice Stevens for himself and three others—resulted in the overturning of the challenged regulations.

The argument today on behalf of Dr. Holsclaw puts heavy emphasis on the Second Circuit majority's strong leaning in finding the Act did not cover medical decisions relating to infants with birth defects. The argument for defendant Holsclaw also emphasizes the observation of Justice Stevens in the plurality opinion in *Bowen v. American Hospital Ass'n*, that "[t]he legislative history of the Rehabilitation Act does not support the notion that Congress intended intervention by federal officials into treatment decisions traditionally left by state law to concerned parents and the attending physicians or, in exceptional cases, to state agencies charged with protecting the welfare of the infant." 476 U.S. at 644 n. 33, 106 S.Ct. at 2121 n. 33.

Counsel noted that federal judges are federal officials, and, therefore, presumably within the ambit of Justice Stevens' observation that there is no support in the legislative history for "the notion that Congress intended intervention by federal officials into treatment decisions traditionally left by state law to concerned parents and the attending physicians or, in exceptional cases, to state agencies charged with protecting the welfare of the infant."

The apparent breadth of the Court's language should, I think, be qualified by recollection that the observation was made in a footnote, namely footnote 33, which commences on page 644 of 476 United States Reports, and runs to 645. That footnote is addressed to a paragraph of text in which

Justice Stevens is addressing the authority that Congress is to be presumed to have delegated to the Executive Branch, in the person of the Secretary of Health and Human Services, to issue implementing regulations.

But, more to the point, the plurality opinion has cautionary language in the text which, in my judgment, substantially undercuts any reason for supposing that footnote 33 was contemplated as removing from Section 504's ambit any scenario in which medical decisions affecting handicapped infants would play a part. The plurality opinion, having detailed at some length the course of the litigation in the Second Circuit, and having summarized not only the opinion of the majority in the *University Hospital* case, but also the substantial dissent by Judge Winter, goes on to say—and I'm now quoting from page 624—"Nor does this case, in contrast to the *University Hospital* litigation, involve a claim that any specific individual treatment decision violates § 504. This suit is not an enforcement action, and as a consequence it is not necessary to determine whether § 504 ever applies to individual medical treatment decisions involving handicapped infants." 476 U.S. 624, 106 S.Ct. 2111.

I think it is reasonably clear, therefore, that the four members of the majority who are the plurality signing Justice Stevens' opinion were expressly disclaiming any resolution of the large issue pressed by those who would say that Section 504 has no application in any instance to medical decisions affecting handicapped infants.

We have, of course, no evidence of Chief Justice Burger's thinking, beyond the fact that he concurred in the judgment, and Justice Rehnquist took no part. Justice White dissented and was joined by Justice Brennan, and was joined in most of his opinion, though not in its entirety, by Justice O'Connor.

In Justice White's opinion, in section two, which both Justice Brennan and Justice O'Connor joined, Justice White explored an example of a medical treatment decision which he felt would fall within the coverage of Section 504. In discussing the Sec-

ond Circuit's decision in *University Hospital,* Justice White had this to say: "Even under the Court of Appeals' interpretation of 'otherwise qualified,' however, it does not follow that § 504 may never apply to medical treatment decisions for the newborn. An esophageal obstruction, for example, would not be part and parcel of the handicap of a baby suffering from Down's Syndrome, and the infant would benefit from and is thus otherwise qualified for having the obstruction removed in spite of the handicap. In this case, the treatment is completely unrelated to the baby's handicapping condition. If an otherwise normal child would be given the identical treatment, so should the handicapped child, if discrimination on the basis of the handicap is to be avoided." 610 U.S. 648, 655, 106 S.Ct. 2123, 2127 (White, J., dissenting).

The argument made by plaintiff for finding in the complaint, and most particularly in paragraph 28, a cognizable claim of discrimination under Section 504 rests essentially on the model provided by Justice White in his dissent in Bowen. Now to be sure, Justice White was writing in dissent, but the logic of the plurality opinion, as I read that opinion, does not involve a disagreement with the observations of Justice White that I have just quoted. As I have suggested, the plurality opinion really puts the kind of question addressed by Justice White aside as unnecessary for determination in *Bowen,* which as I pointed out, related to the viability of certain regulations adopted by the Secretary.

Under the circumstances, I am prepared to accept the example offered by Justice White, and supported by Justice Brennan and Justice O'Connor, as a description of a cognizable claim under Section 504. I find nothing in the plurality opinion in *Bowen* that is incompatible with that perception, and there are no other cases that I am aware of, in the Supreme Court or elsewhere, except to the extent that the majority opinion in *University Hospital* may have a momentum running in the other direction—and, of course, *University Hospital* antedated *Bowen*—that would tend to cast substantial doubt on Justice White's formulation.

I would say parenthetically that the decision of Chief Judge Finesilver in *Ross v. Hilltop Rehabilitation Hospital,* 676 F.Supp. 1528 (D.Colo.1987), although it may be thought to cut against a claim of the thought asserted here, and also a claim of the kind discussed by Justice White, does not seem to me entirely pertinent. *Ross* is a case that was decided at summary judgment and ultimately rested, as I read it, on the facts developed in discovery, although of course Judge Finesilver had much to say about the governing law of Section 504. At all events, I am prepared to proceed on the basis of Justice White's example, with a view to determining whether the complaint before us can be thought to track that scenario.

In the present case, as I say, the theory of the complaint, as elaborated in supporting memorandum and oral argument today, is that Erika was discriminated against in the sense of being treated more aggressively and painfully and persistently than her parents wished, for the reason that she, Erika, was not "a conscious adult," but an infant unable to speak for herself. The plaintiffs' theory then is that, just as in Justice White's example—where an infant suffering from Down's Syndrome was not treated for his esophageal blockage because the infant suffered from the handicap of Down's Syndrome—so here an infant suffering from the handicap of cystic fibrosis was subjected to a course of treatment not assented to by the family for the reason that she was incompetent to effectively object. The handicap, the status of incompetence, thus becomes a second handicap and the one on the basis of which discrimination was pursued.

In considering whether the analogy to Justice White's example is a complete one, there is an initial question whether Justice White perceived the Down's Syndrome baby as suffering from two handicaps, as plaintiff's counsel in this case contends that Erika was suffering from two handicaps. It is worth reverting to Justice White's language: "An esophageal obstruction, for example, would not be part and parcel of the handicap of a baby suf-

fering from Down's Syndrome, and the infant would benefit from and is thus otherwise qualified for having the obstruction removed in spite of the handicap. In this case, the treatment is completely unrelated to the baby's handicapping condition. If an otherwise normal child would be given the identical treatment, so should the handicapped child if discrimination on the basis of the handicap is to be avoided." 610 U.S. at 655, 106 S.Ct. at 2127.

I think that a reasonable reading of that series of sentences could well lead to the conclusion that Justice White saw only one handicap within the meaning of the statutory language, that being the Down's Syndrome. Under that reading, what he was addressing was a situation in which discrimination against the category of infants suffering from Down's Syndrome would lead to a medical determination not to address a particular baby's esophageal obstruction for the reason that the baby suffered from the "handicap," to use the statutory word, of Down's Syndrome.

Under that reading of Justice White's language, it would not seem an indispensable part of the logic to characterize the esophageal obstruction as itself a "handicap" within the meaning of the statute. By contrast, in the case before us, the differentiating condition, according to the complaint as enlarged in memorandum and argument, is not the cystic fibrosis that Erika suffered from, as the differentiating complaint in Justice White's example was the Down's Syndrome. The differentiating complaint is the condition of incompetence that flows from Erika not having been a "conscious adult."

If, however, we were to accept that indeed Justice White did perceive the Down's Syndrome baby as suffering from two handicaps, the Down's Syndrome and the esophageal obstruction, we must then consider whether, in the case before us, the discrimination described in paragraph 28 hinges upon a "handicap" within the meaning of the statute. That is to say whether the condition of being not a "conscious adult" is such a statutory handicap.

It is clear that cystic fibrosis is such a handicap, but, as noted, that is not the condition that is alleged to be the occasion for this challenge of discrimination. It would, in my judgment, be relatively easy to suppose sorts of incompetence which could very readily be characterized as handicaps within the meaning of the statutory language.

A person who is retarded, for example, would, notwithstanding adultness, perhaps depending on the degree of retardation, not be in a position to present in an effective and coherently communicating fashion a range of questions and complaints about administrative protocol being administered; so, too, would a person suffering from forms of senility, perhaps including—most surely including—Alzheimer's disease. These would be conditions of non-competence, as would, perhaps, conditions of untreatable schizophrenia that would render a person arguably—I should suppose not with great difficulty—arguably handicapped within the meaning of the statute.

Infancy is not having attained adulthood, being indeed so many years away from an adulthood that one cannot articulate in words, that is to say, in noises that would be understood by other than a baby's parents. Is that a condition of incompetence that would qualify as a handicap under the statute?

I think we must look again at the definition. An "individual with handicaps" is described by the statute as being "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B).

In my judgment, to characterize infancy as "a physical or mental impairment" involves such tortured use of language that, without far more specific direction from Congress than is afforded by anything in the statutory language or the attendant legislative history, I would see no reason to subscribe to. Infancy is a universal stage. It is most surely a stage of dependency,

but it is not in any common parlance a stage of physical or mental impairment.

So I find myself unable to assent to a characterization of the cause of action in this case, which depends upon Erika's being a member of the universe of non-conscious adults (because she was an infant) as the occasion for the alleged discrimination, thereby bringing her within the statute. I would note parenthetically that in the Health and Human Services regulations elaborating on the statute (regulations not disturbed by the decision in *Bowen*), we are told in Appendix A that "[t]he definition of handicapped person also includes specific limitations on what persons are classified as handicapped under the regulation. The first of the three parts of the definition specifies that only physical and mental handicaps are included. Thus, environmental, cultural, and economic disadvantage are not in themselves covered; nor are prison records, age, or homosexuality. Of course, if a person who has any of these characteristics also has a physical or mental handicap, the person is included within the definition of handicapped person." 45 CFR § 84, App. A at 345 (1987).

In the present case, however, as I have noted, the discrimination which is alleged is not a discrimination said to arise from Erika's undoubted status as a person handicapped by cystic fibrosis. The discrimination is alleged on the basis of her infancy.

For these reasons, I conclude that the complaint does not state a claim under Section 504 of the Rehabilitation Act. Since the complaint fails with respect to the federal claim, it must be dismissed also with respect to the asserted state law claim or claims. I will enter a written order granting the motions to dismiss the complaint.