### John WOOLFOLK

v.

### Theodore G. DUNCAN, et al.

### Civ. A. No. 94–1532.

United States District Court,
E.D. Pennsylvania.

Jan. 5, 1995.

Christopher J. Evarts, Joseph L. Di Tomo, Jr., P.C., Philadelphia, PA, for plaintiff.

James P. Kilcoyne, Jr., Plymouth Meeting, PA, John J. Snyder, McDonald & Snyder, P.C., Philadelphia, PA, Melissa C. Bittner, James P. Kilcoyne & Associates, Plymouth Meeting, PA, for Theodore G. Duncan, M.D.

Adrian R. King, Jonathan B. Sprague, Post & Schell, PC., Philadelphia, PA, for Penn. Hosp.

Daniel J. Ryan, Jacqueline M. Carolan, Maria B. Mazzeo, La Brum and Doak, Philadelphia, PA, for HealthPASS. .

## OPINION

PADOVA, District Judge.

Plaintiff, John Woolfolk, alleges that Defendants, Dr. Theodore G. Duncan, Pennsylvania Hospital ("PH"), and HealthPASS,[1] refused to provide medical treatment because he has tested positive for the Human Immunodeficiency Virus ("HIV").[2] Woolfolk seeks relief pursuant to § 504(a) of Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C.A. § 794(a) (West Supp.1994), the Americans With Disabilities Act ("ADA"), 42 U.S.C.A. §§ 12101–12213 (West Supp.1994), and state law.[3] Pursuant to Federal Rule of

---

1. HealthPASS is a managed care medical assistance program created by the Pennsylvania Department of Public Welfare that is operated by Healthcare Management Alternatives ("HMA").

2. Woolfolk's second amended complaint alleges that he was discriminated against because he has tested positive for HIV; he does not allege that

he was discriminated against because he has developed Acquired Immune Deficiency Syndrome ("AIDS").

3. Woolfolk alleges the following state law claims against Duncan: (i) intentional infliction of emotional distress, (ii) breach of implied contract, and (iii) abandonment. Duncan seeks summary

Civil Procedure 56, all Defendants seek summary judgment; PH also seeks attorney fees. For the reasons set forth below, I shall grant in part and deny in part Defendants' motions for summary judgment, and I shall deny PH's motion for attorney fees.

## I. FACTUAL ALLEGATIONS

The following facts are essentially undisputed, except as noted. HealthPASS enrollees may receive medical treatment from participating primary care physicians included on HealthPASS' list of "preferred doctors." At all times relevant to this dispute, Duncan was a participating physician,[4] and Woolfolk was a HealthPASS enrollee who had selected Duncan as his primary care physician. Duncan is a member of PH's professional staff, and serves as chief of its diabetes section, but he receives no income from PH. HealthPASS pays Duncan to treat HealthPASS enrollees. Duncan maintains private medical office space ("Office") at the Franklin Medical Building in Philadelphia, but neither PH nor HealthPASS has any ownership interest in the Office.

On June 29, 1992, Woolfolk learned that he was HIV-positive, that is, had tested positive for HIV. On November 30, 1992, Woolfolk informed Duncan of his HIV status during a visit at the Office. On December 7, 1992, Woolfolk again visited the Office, and he informed Duncan that a second test confirmed his HIV status. Duncan allegedly informed Woolfolk that he did not "treat HIV," but rather referred patients with HIV-related difficulties to an infectious disease specialist. Duncan also allegedly recommended that Woolfolk join a support group for HIV-positive individuals.

Woolfolk did not see Duncan again until November 1, 1993, when he sought treatment at the Office for lower chest pain. Duncan performed a physical examination, which revealed that Woolfolk's temperature was normal, but that he had tenderness on the left side of his chest, and had increased pain with breathing. Duncan ordered a chest x-ray, which was performed at PH, and a urinalysis, which was performed at the Office. Duncan alleges that neither test revealed abnormal results. Duncan diagnosed Woolfolk's symptoms as muscle pain, prescribed an analgesic, told him to go home, and told him to return to the Office if his symptoms did not improve.

On November 2, 1993, Duncan authorized Woolfolk's treatment at the Thomas Jefferson University Hospital ("Jefferson") emergency room. Woolfolk was treated for musculoskeletal pain and seizures, and then released in the early morning hours of November 3, 1993.

On November 4, 1993, Woolfolk returned to Duncan's Office complaining about continued discomfort. Duncan asserts that Woolfolk was agitated and demanded to be admitted to a hospital emergency room. Woolfolk alleges that Duncan told him that he did not need emergency care, but could be adequately treated in the Office. Duncan also suggested that Woolfolk see a psychiatrist. Woolfolk allegedly refused, and stated that he was going to an emergency room.

On November 7, 1993, Woolfolk was brought by police to Jefferson's emergency room, complaining of shortness of breath, vomiting, fever, and breathing pain. The hospital records indicate that Duncan refused to authorize Woolfolk's emergency room treatment.[5] Nevertheless, Woolfolk was admitted to Jefferson for gastrointestinal hemorrhaging. Woolfolk remained at Jefferson until November 18, 1993. Upon discharge, Woolfolk was diagnosed as having

judgment on all state law claims except breach of implied contract.

Woolfolk alleges that PH and HealthPASS negligently hired Duncan, and that HealthPASS breached its contract with Woolfolk. Woolfolk also seeks punitive damages from all three defendants.

Although the second amended complaint does not expressly assert claims against PH and HealthPASS based on *respondeat superior,* the parties have interpreted the second amended complaint as asserting such claims.

4. Pursuant to a Primary Care Physician Agreement ("Agreement") between Duncan and HMA, Duncan agreed to "render medical services to HealthPASS ENROLLEES". Pl.'s Br. (Doc. No. 28) Ex. B, § I.D.

5. Duncan disputes that he refused to authorize Woolfolk's emergency care. Duncan Dep. at 44.

pneumonia, staph aureus bacteremis, upper GI bleeding, and AIDS.

Woolfolk alleges that Duncan treated him "like an outcast" because he is HIV-positive, and never made any *bona fide* medical judgments about Woolfolk's condition.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

██ An issue is "genuine" only if there is sufficient evidence with which a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. *See id.* at 248, 106 S.Ct. at 2510.

██ A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

## III. DISCUSSION

I shall first address Woolfolk's claims against Duncan, and then discuss Woolfolk's claims against PH and HealthPASS. Finally, I shall address PH's motion for attorney fees.

### A. DUNCAN

#### 1. Rehabilitation Act Claim

██ The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." § 794(a). This statutory section "creates a private right of action in favor of persons who allege to have been subjected to illegal discrimination based on handicap." *Strathie v. Department of Transp.*, 716 F.2d 227, 229 (3d Cir.1983).

██ Duncan asserts that Woolfolk's Rehabilitation Act claim fails because (1) Woolfolk was not "otherwise qualified" for medical treatment because, but for his HIV status, Woolfolk would not be eligible for medical treatment; and (2) Duncan continued to treat Woolfolk after learning that he was HIV-positive, so that Woolfolk cannot demonstrate that he was excluded from treatment "solely by reason of ... his disability." [6] I disagree as to both assertions.

██ The Rehabilitation Act has been applied predominantly to challenge allegedly discriminatory denials of employment or admission to educational programs. *See, e.g., School Bd. of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (employment); *Southeastern Commun. College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (educational programs). Guided by the premise that "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context," the Supreme Court has held that a person is "otherwise qualified" if he "meet[s] all of a program's re-

---

**6.** Duncan does not dispute that he receives federal financial assistance, or that a person who is HIV-positive has a disability within the meaning of the Rehabilitation Act.

quirements in spite of his handicap." *Davis,* 442 U.S. at 405–06, 99 S.Ct. at 2366–67). The "otherwise qualified" criterion in the employment and education contexts, therefore, connotes a functional component. However, such an interpretation may not readily transfer to the context of medical benefits [7] because it may be meaningless to speak in terms of functional requirements for medical care.

Nevertheless, simply because the functional standard adopted in employment and education does not neatly "fit" in the medical benefits context does not necessarily mean that the Rehabilitation Act does not apply to that context.[8] *Cf. Bowen,* 476 U.S. at 624, 106 S.Ct. at 2110–11 (1986) (plurality opinion) (recognizing that a hospital rule or state policy limiting the "meaningful access" of an infant with a disability to medical services provided by hospitals is subject to challenge under the Rehabilitation Act); [9] *id.* at 656, 106 S.Ct. at 2127 (White, J., dissenting) ("Where a decision regarding medical treatment for a handicapped newborn properly falls within the statutory provision, it should be subject to the constraints set forth in § 504."); *Alexander v. Choate,* 469 U.S. 287, 304, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (reviewing, under the Rehabilitation Act, modification of healthcare benefits provided by state Medicaid program). *See also* 45 C.F.R. 84.52 (1993) (relying on Rehabilitation Act to prohibit discrimination against individuals with disabilities with regard to health services); *Alexander,* 469 U.S. at 304 n. 24, 105 S.Ct. at 722 n. 24 (Department of Health and Human Services ("HHS") regulations are an important source of guidance on the meaning of the Rehabilitation Act).[10]

■ In the context of medical benefits, a more meaningful "otherwise qualified" stan-

7. "Medical benefits" may include not only medical treatment itself, but also referrals to specialty and hospital care. *See Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 653 n. 7, 106 S.Ct. 2101, 2126–27 n. 7, 90 L.Ed.2d 584 (1986) (White, J., dissenting) (benefits provided by hospitals and doctors covered by the Rehabilitation Act may include not only treatment, but also providing medical advice to patients who cannot make their own medical treatment decisions).

8. Indeed, examples of disability discrimination by healthcare providers are disturbingly real. With respect to discrimination based on HIV status, one commentator has noted that

in a survey of a random sample of office-based primary care physicians in Los Angeles County, 48% of physicians in the sample had elected not to care for, or said they would not provide care for, patients with HIV infection. Another survey suggests that this reluctance to care for adult patients with HIV flows from a combination of factors, including negative attitudes towards homosexuals and IV drug users, fear of contagion, and the time demands imposed by caring for an HIV patient.

Mary A. Crossley, *Of Diagnoses and Discrimination: Discriminatory Nontreatment of Infants with HIV Infection,* 93 Colum.L.Rev. 1581, 1602 (1993) [hereinafter *Discriminatory Nontreatment* ]. *But see* R. Abadie and E. Hoffman, *Physician Practices and Attitudes on HIV–Related Issues: A Survey of LSMS Primary Care Physicians,* 144 J.La.State Med.Soc. 283 (1992) (study of primary care physicians in Louisiana revealed that although most respondents had not treated HIV-positive patients, they would readily do so, and their reluctance was based on concern over

scientific knowledge, rather than bias against such patients).

9. The *Bowen* plurality asserted, however, that because "no such rule or policy [has been] challenged, or indeed has been identified, in this case[,] ... it is not necessary to determine whether § 504 ever applies to individual medical treatment decisions involving handicapped infants." *Bowen,* 476 U.S. at 624, 106 S.Ct. at 2111.

10. I note that there is no controlling Supreme Court or Third Circuit authority on application of the Rehabilitation Act in the context of medical benefits. *See Bowen,* 476 U.S. at 624, 106 S.Ct. at 2111 (plurality opinion) (deciding on procedural grounds that HHS lacked authority to promulgate mandatory rules regarding health care for handicapped infants, and declining to decide whether the Rehabilitation Act applies to individual medical treatment decisions involving such infants). The Second and Tenth Circuits have addressed the issue, but under different factual scenarios from the one presented here.

In *United States v. University Hosp.,* 729 F.2d 144 (2d Cir.1984), HHS relied on the Rehabilitation Act to seek access to hospital records of a child born with spina bifida who was allegedly being denied medically indicated treatment solely on the basis of her handicap. The Court of Appeals very narrowly defined the issue in the case: "Did congress intend section 504 to reach the conduct HHS seeks to investigate? If the investigation is within the scope of section 504, then HHS is entitled to [the infant's] medical records.... On the other hand, if the investigation is beyond the scope of section 504, then the district court properly denied access." *Id.* at

dard may be based on the premise that disability alone is not a permissible ground for withholding medical benefits. *Cf. Discriminatory Nontreatment* at 1654 (arguing that what is impermissible under the Rehabilitation Act and the ADA is "a decision-maker's reliance on the mere existence of disability as a proxy for an individualized, factual assessment of the disabled person's condition"). This principle is particularly acute where the plaintiff seeks medical benefits from a primary care physician ("PCP") in a managed healthcare system ("MHS").[11] In such a system, the participant depends upon the PCP not only for medical treatment, but also for other benefits, such as authorization for hospitalization and referrals to specialty care.[12] *See* Member Handbook at 5. I therefore conclude that an MHS participant with a disability is "otherwise qualified" for medical benefits if there is no factor apart from the mere existence of disability that renders the participant unqualified for the benefit.[13]

 If the MHS participant is otherwise qualified for medical benefits (*e.g.*, satis-

150. The Court of Appeals held that the Rehabilitation Act did not authorize the involvement of government personnel in medical treatment decisions, and denied HHS' access to the infant's records. *Id.* at 160. The court's primary concern was whether the statute permitted the government to require affirmative medical treatment. That fact situation is not presented here, because Woolfolk does not seek affirmative treatment, but rather challenges an allegedly unequal denial of treatment. The Second Circuit's analysis of the Rehabilitation Act's "otherwise qualified" and "solely based on disability" criteria is therefore largely dicta.

In *Johnson v. Thompson,* 971 F.2d 1487 (10th Cir.1992), parents of children born with spina bifida alleged that a group of doctors discriminatorily denied medical treatment based on handicap and socioeconomic status by recommending non-aggressive treatment for the children. Based *solely* on *University Hosp.,* the Court of Appeals rejected the parents' Rehabilitation Act claim:

> The "otherwise qualified" language, when considered in conjunction with the "solely" language of the third condition, poses a formidable obstacle for anyone alleging discrimination in violation of section 504 based upon the failure to receive medical treatment for a birth defect. Such a plaintiff must prove that he or she was discriminatorily denied medical treatment because of the birth defect and, at the same time, must prove that, in spite of the birth defect, he or she was "otherwise qualified" to receive the denied medical treatment. Ordinarily, however, if such a person were not so handicapped, he or she would not need the medical treatment and thus would not "otherwise qualify" for the treatment.

*Id.*

I note that other courts in this district have followed *University Hosp.* and *Johnson. See Wagner v. Fair Acres Geriatric Center,* 859 F.Supp. 776, 782–84 (E.D.Pa.1994); *Toney v. U.S. Healthcare,* 840 F.Supp. 357, 360–62 (E.D.Pa.1993), *aff'd without opinion,* 37 F.3d 1489 (3d Cir.1994). Because the district court in *Toney* granted summary judgment for the health care provider based on multiple grounds, and because the district court's ruling was affirmed without opinion, I am unable to determine whether the Court of Appeals approved the district court's reliance on *University Hosp.* and *Johnson* for the proposition that "otherwise qualified" for medical treatment requires symptoms unrelated to the disability. I note, however, that there are genuine issues of material fact as to whether Woolfolk sought treatment for conditions unrelated to his HIV status. *See* Pl's Br. (Doc. No. 53) Ex. C, Duncan–4 at 2; Pl.'s Br. (Doc. No. 28) Ex. C, P–6 at 1 (Woolfolk was treated at Jefferson for, among other things, a recurring seizure disorder that may have predated his HIV infection).

11. HealthPASS is an MHS, in which an enrollee's medical needs are supervised by a PCP. *See* Def.'s Br. (Doc. No. 15) Ex. C ("Member Handbook") at 4–5.

12. In an MHS, the PCP exerts almost total control over the participant's comprehensive health care needs. *See* Member Handbook at 8 ("Your PCP ... is the key to your healthcare. Your PCP will manage most of your healthcare needs and help you get the healthcare you need.... [M]ost of your healthcare will be provided, arranged for, and authorized by your PCP."); *id.* at 10 ("Unless it's an emergency, your doctor will decide if you receive care from a hospital."); *id.* at 11 ("Your PCP is always the first person to call, unless you have a life-threatening emergency."); *id.* at 12 ("Certain services which are not provided by your PCP, such as specialist care, must be pre-approved by your doctor."); *id.* at 17 ("Your HealthPASS plan covers treatment by specialists, as long as your PCP says that you need one."). *Given such extensive control, the PCP may effectively foreclose the participant's access not only to medical treatment, but also to any necessary specialty and hospital care.*

13. In the employment and education contexts, the Court rejected an "otherwise qualified" standard that prevents an institution from taking the plaintiff's disability into account when determining whether the plaintiff meets the program's functional requirements. *Davis,* 442 U.S. at 406, 99 S.Ct. at 2367. In the medical benefits context, this concern is better addressed by deter-

fies plan eligibility requirements), the focus appropriately shifts to the defendant's reasons for withholding the benefit. A PCP who receives federal funds to provide healthcare benefits may not withhold medical benefits, without reasonable accommodation, *solely* based on a participant's disability, but may only act pursuant to a *bona fide* medical reason. *Cf. Alexander*, 469 U.S. at 301–02, 105 S.Ct. at 720 ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit the grantee offers.... [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."); *Discriminatory Nontreatment* at 1651 (ADA should prohibit treating a patient differently simply on the existence of disability). *See also University Hosp.*, 729 F.2d at 162 (Winter, J., dissenting) (Rehabilitation Act permits inquiry into whether a medical treatment decision was based on a *bona fide* medical judgment, or based solely on disability); *Glanz v. Vernick*, 750 F.Supp. 39, 46 (D.Mass.1990) (same).[14]

With these concepts in mind, I conclude that summary judgment for Duncan is inappropriate. First, I cannot conclude as a matter of law that Woolfolk was not "otherwise qualified" for medical treatment, hospitalization, or referral to specialty care because the record does not establish that any factor apart from the mere existence of Woolfolk's HIV status made him unqualified for these benefits.

Second, there are genuine issues of material fact as to whether Duncan withheld medical benefits solely based on Woolfolk's HIV status. First, Woolfolk's expert report suggests that from November 1, 1994 through November 4, 1994, Duncan provided Woolfolk with substandard medical treatment. *See* Pl.'s Br. (Doc. No. 53) Ex. A (stating that

"[t]here was absolutely no medical justification for Dr. Duncan's behavior which in my estimation amounted to refusal of necessary and essential medical care and abandonment of the patient").[15] Second, the record contains evidence from which a jury reasonably could conclude that although Duncan does not feel qualified to treat HIV-related illnesses, and although Woolfolk repeatedly sought treatment, Duncan took no *bona fide* measures to ensure that Woolfolk received medical care, which he would do for seriously ill non-HIV-positive patients. *Compare* Duncan Dep. at 30 (Duncan would actively refer seriously ill non-HIV-positive patients to medical specialists) *and id.* at 38 (Duncan does not feel qualified to treat patients who are HIV-positive) *with id.* at 54 (although Duncan does not "treat" a person with AIDS, he also does not actively refer the person to an infectious disease specialist) *and id.* at 56 (Duncan suggested, but did not actually refer Woolfolk to an infectious disease specialist). *See Bowen*, 476 U.S. at 655 n. 8, 106 S.Ct. at 2127 n. 8 (White, J., dissenting) (arguing that " 'reasonable accommodation' might require more than mere impartial dispensing of identical medical treatment"); *cf. id.* at 659, 106 S.Ct. at 2129 (White, J., dissenting) ("Discrimination may occur when a doctor encourages or fails to discourage a parental decision to refuse consent to treatment for a handicapped child when the doctor would discourage or actually oppose a parental decision to refuse consent to the same treatment for a nonhandicapped child."). Third, Woolfolk has produced evidence that on November 7, 1993, Duncan refused to authorize emergency medical care for Woolfolk. Pl.'s Br. (Doc. No. 53) Ex. C, Duncan–6. Woolfolk has therefore carried his burden of showing material issues of fact as to whether Duncan provided substandard care, refused to authorize Woolfolk's hospitalization, and failed to

mining whether the defendant withheld the benefit "solely by reason of the disability," or whether the defendant acted based upon a *bona fide* medical reason.

**14.** I therefore am not persuaded that "[w]here the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory.' " *University Hosp.*, 729 F.2d at 157. A jury need not con-

clude *with certainty* that a decision to withhold treatment was discriminatory, but need only conclude by a fair preponderance of evidence that the decision was discriminatory.

**15.** The focus of Woolfolk's Rehabilitation Act claim is whether Duncan treated him differently because of his HIV status. Evidence that Duncan's behavior fell below an acceptable standard of care may provide circumstantial support for this claim.

refer Woolfolk to specialty care, all without a *bona fide* medical justification, and solely because Woolfolk is HIV-positive.[16]

Accordingly, because there are genuine issues of material fact regarding whether Woolfolk was otherwise qualified for medical benefits, and whether Woolfolk was denied medical benefits solely because of his HIV status, I shall deny summary judgment for Duncan on this claim.

## 2. ADA Claims

The ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the ... services ... of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C.A. § 12182 (West Supp.1994). Private hospitals and professional offices of health care providers are places of public accommodation for purposes of § 12182. 42 U.S.C.A. § 12181(7)(F) (West Supp.1994).

Duncan asserts that he is entitled to summary judgment on the ADA claim because Woolfolk has no evidence that Duncan treats all HIV-positive patients differently than non-HIV-positive patients. However, nothing in the language of the statute requires such proof.[17] *See* 42 U.S.C.A. § 12188(a). Accordingly, I shall deny summary judgment for Duncan on this claim.

## 3. State Law Claims

### a) Intentional Infliction of Emotional Distress

To recover for intentional infliction of emotional distress, a plaintiff must establish (1) intentional or reckless conduct

by the defendant that was (2) extreme and outrageous (3) causing (4) severe emotional distress. *See Williams v. Guzzardi*, 875 F.2d 46, 52 (3d Cir.1989). Duncan asserts that Woolfolk's emotional distress claim fails because Duncan's conduct was not sufficiently outrageous. I cannot conclude as a matter of law that Duncan's alleged failure to provide medical benefits was not sufficiently extreme. *See Winterberg v. CNA Ins. Co.*, 868 F.Supp. 713 (E.D.Pa.1994) (refusing to dismiss intentional infliction of emotional distress claim where examining doctor demanded that injured patient attempt to walk, and then refused to help her up, and then berated her after she fell to the floor); *Hoffman v. Memorial Osteopathic Hosp.*, 342 Pa.Super. 375, 492 A.2d 1382 (1985) (concluding that jury could find intentional infliction of emotional distress where emergency room physician ignored the pleas for help of a patient suffering from a neurological disease who had fallen to the floor and was allowed to remain there for more than one hour); *see also Guzzardi*, 875 F.2d at 52 (noting that Pennsylvania courts have been more amenable to intentional infliction of emotional distress claims when they involve special relationships between plaintiff and defendant); *see also Howe v. Hull*, 874 F.Supp. 779, 790 (N.D.Ohio 1994) (refusing to conclude as a matter of law that a physician's refusal to treat a seriously ill patient for any discriminatory reason is not extreme and outrageous conduct); *Miller v. Spicer*, 822 F.Supp. 158, 169–70 (D.Del.1993) (same). Accordingly, I shall deny summary judgment for Duncan on this claim.

### b) Abandonment

Woolfolk's second amended complaint includes a separate claim against Dun-

---

**16.** I also note that Woolfolk does not seek affirmative medical care, but instead challenges allegedly unequal medical treatment. *Cf. University Hosp.*, 729 F.2d at 160 (Rehabilitation Act seeks to secure evenhanded treatment of qualified persons with disabilities, but does not require affirmative efforts to overcome the disabilities caused by handicaps).

**17.** Duncan incorrectly cites *United States v. Morvant*, 843 F.Supp. 1092, 1095 (E.D.La.1994), for the proposition that a plaintiff must show that the defendant engaged in a "pattern or practice"

of discrimination in violation of the ADA. In *Morvant*, the Attorney General filed suit on behalf of HIV-positive individuals, and alleged that the defendant engaged in a "pattern or practice" of discrimination. *Id.* at 1094. However, the Attorney General may commence a civil action under the ADA even if the defendant has not engaged in a "pattern or practice" of discrimination. *See* 42 U.S.C.A. 12188(b)(1)(B)(ii) (West Supp.1994). Thus, the ADA does not require such proof.

can for "abandonment." This charge is perplexing because Woolfolk has not cited any authority showing that such a cause of action exists in Pennsylvania. Although abandonment may constitute evidence of negligence, *see, e.g., Morena v. South Hills Health Sys.,* 501 Pa. 634, 462 A.2d 680, 685 (1983), Woolfolk has never clearly alleged that Duncan was negligent.[18] However, evidence of abandonment may be used to show that the defendant acted with reckless indifference to the plaintiff's interests, such that punitive damages may be appropriate. *See Medvecz v. Choi,* 569 F.2d 1221, 1227–28 (3d Cir.1977). Accordingly, I shall grant summary judgment for Duncan on Woolfolk's abandonment "claim," but note that Woolfolk's evidence, if any, of abandonment may be used to support a demand for punitive damages.

### c) Punitive Damages

Duncan does not assert that punitive damages may not be awarded under the Rehabilitation Act, or the ADA, or under Pennsylvania law for breach of implied contract or intentional infliction of emotional distress; instead, Duncan alleges that his conduct was not sufficiently outrageous to justify punitive damages in this case. That, however, is an issue of fact for the jury. *See Doe v. Kohn, Nast, & Graf, P.C.,* 862 F.Supp. 1310, 1329 (E.D.Pa.1994). Accordingly I shall not grant summary judgment for Duncan on this prayer for relief.

### B. PH and HealthPASS

Woolfolk asserts that PH and HealthPASS are vicariously liable for Duncan's conduct. Additionally, Woolfolk alleges that PH and HealthPASS negligently hired Duncan, and that HealthPASS breached its contract with Woolfolk.[19] I shall first address vicarious liability, and then address the other claims.

### 1. Vicarious Liability

Under Pennsylvania law, an employer may be liable for the intentional torts committed by a servant,[20] but not for those committed by an independent contractor. *See Capan v. Divine Providence Hosp.,* 287 Pa.Super. 364, 430 A.2d 647, 648 (1980); *Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476, 481 (1970).[21] A person is a servant if her master not only controls the result of the work, but has the right to direct the way it is performed. *See Jones v. Century Oil U.S.A., Inc.,* 957 F.2d 84, 86 (3d Cir.1992). A servant "remains entirely under the control and direction of the master." *Id.* at 87 (internal quotations omitted). By contrast, an independent contractor retains exclusive control over the manner in which the work is performed. *See Moon Area School Dist. v. Garzony,* 522 Pa. 178, 560 A.2d 1361, 1367 (1989). Except where the facts are undisputed, the jury determines whether an agent is a servant or an independent contractor. *Feller v. New Amsterdam Cas. Co.,* 363 Pa. 483, 70 A.2d 299, 300–301 (1950). The parties do not dispute that Duncan performed services for PH and HealthPASS, but disagree as to Duncan's status as servant or independent contractor.

Summary judgment for PH is appropriate because even if I assume that Duncan was PH's servant, Woolfolk has offered no evidence that Duncan's private medical prac-

---

**18.** Woolfolk has never alleged negligence despite being granted permission to file *two* amended complaints.

**19.** Woolfolk also asserts Rehabilitation Act claims against PH and HealthPASS based on direct and vicarious liability, ADA claims against PH based on direct and vicarious liability, and ADA claims against HealthPASS based on vicarious liability.

**20.** Further, an employer may be held liable for a servant's tortious conduct only if that conduct falls within the scope of the servant's employment. *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1276 (3d Cir.1979). A

servant's conduct is within the scope of his employment only if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." *Butler v. Flo–Ron Vending Co.,* 383 Pa.Super. 633, 557 A.2d 730, 736 (1989) (quoting Restatement (Second) of Agency § 228).

**21.** Under the "ostensible agency" theory, an employer may be liable for the physical harm caused by an independent contractor's negligent conduct. *See Capan,* 430 A.2d at 648–49. Because Woolfolk has never alleged that Duncan was negligent, Woolfolk therefore may not rely on the "ostensible agency" theory of liability.

tice was within the scope of Duncan's employment. Specifically, Woolfolk has offered no evidence that PH employed Duncan to perform private medical services *at the Office*, or that PH specified any time and space limits on Duncan's private medical practice *at the Office*, or that Duncan's private practice was actuated in any way by a purpose to serve PH.[22]

 However, summary judgment for HealthPASS is inappropriate because there are genuine issues of material fact regarding Duncan's status as servant or independent contractor. The Agreement provides that HMA has the right to exercise significant control over Duncan's medical practice with respect to HealthPASS enrollees. *See* Pl.'s Br. (Doc. No. 28) Ex. B, § III.B (limiting physician's ability to refuse services to enrollees); *id.* § III.C (restricting physician's ability to transfer coverage of an enrollee to another physician); *id.* § V.A (specifying services that physician may provide to enrollees); *id.* (prohibiting physician from collecting fees from enrollees for covered services); *id.* § V.C (limiting physician's ability to refer enrollee for specialist care); *id.* § V.E (setting time when physician must be available for medical consultation with enrollees); *id.* § V.G (implicitly controlling the types of medical treatment services provided by physician to enrollees); *id.* § VI (authorizing HMA to inspect, at any time during normal business hours, physician's office and services provided to enrollees); *id.* § VII (specifying recordkeeping requirements); *id.*

§ XIII (specifying personnel and training requirements for physician's medical office staff); *id.* § XVIII (prohibiting physician from discriminating against enrollees based on health status). Additionally, Woolfolk has offered evidence that HealthPASS has in fact inspected the Office. *See* Duncan Dep. at 47. Because a jury reasonably could conclude from this evidence that HMA had the right and authority to interfere with and control Duncan's medical treatment of HealthPASS enrollees, there are genuine issues of material fact as to whether Duncan was Health-PASS' servant, acting in the scope of his employment, such that HealthPASS may be vicariously liable for Duncan's alleged conduct.[23]

### 2. Negligent Hiring and Breach of Contract

Woolfolk alleges that PH and HealthPASS negligently hired Duncan, and that Health-PASS breached its contract with Woolfolk. I shall address each issue in turn.

### a) Negligent Hiring

 Woolfolk's negligent hiring allegations are essentially claims under § 411 of the Restatement (Second) of Torts.[24] *See Lutz v. Cybularz*, 414 Pa.Super. 579, 607 A.2d 1089, 1092 (1992) (implicitly adopting § 411). HealthPASS asserts that it never "hired" Duncan, and it therefore is not responsible for his acts. However, because Duncan was at least HealthPASS' indepen-

---

**22.** I shall therefore grant summary judgment for PH on the Rehabilitation Act and ADA claims based on vicarious liability. Further, because the record contains no evidence that PH denied Woolfolk treatment, I shall grant summary judgment for PH on the Rehabilitation Act claim; because the record contains no evidence that PH discriminated against Woolfolk, or owned, leased, or operated Duncan's Office, I shall grant summary judgment for PH on the ADA claim.

**23.** Because I conclude that there are genuine issues of material fact as to whether Duncan was HealthPASS' servant, I shall deny summary judgment for HealthPASS on the Rehabilitation Act and ADA claims based on vicarious liability. *See Bonner v. Lewis*, 857 F.2d 559, 566–67 (9th Cir. 1988) (*respondeat superior* applicable to claims under § 794(a)); *Easley v. Snider*, 841 F.Supp. 668, 672 (E.D.Pa.1993) (interpretations of the

Rehabilitation Act are persuasive authority for interpretations of the ADA), *rev'd on other grounds*, 36 F.3d 297 (3d Cir.1994). However, because the record contains no evidence that HealthPASS denied Woolfolk treatment, I shall grant summary judgment for HealthPASS on the Rehabilitation Act claim based on direct liability.

**24.** Negligence in Selection of Contractor

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411 (1965).

dent contractor, HealthPASS may be liable under § 411. Because HealthPASS has never challenged the substance of Woolfolk's negligent hiring claim, I cannot grant HealthPASS summary judgment. Woolfolk's § 411 claim against PH fails, however, because the record contains no evidence that PH ever employed Duncan to provide primary care medical services to anyone. Accordingly, I shall deny HealthPASS' motion, but grant summary judgment for PH on this claim.[25]

### b) Breach of Contract

■ Beyond his bare allegation, Woolfolk has never identified, or produced evidence of how HealthPASS breached its contract with him. Accordingly, I shall grant summary judgment for HealthPASS on this claim. Woolfolk also seeks to hold HealthPASS liable under *respondeat superior* for Duncan's alleged breach of implied contract. Because Woolfolk has not cited any authority that *respondeat superior* liability exists in such a context, I shall also grant summary judgment for HealthPASS on the implied contract claim.[26]

### C. PH's Motion for Sanctions

■ PH vehemently seeks to have Woolfolk's counsel sanctioned for "vexatiously maintaining this wholly frivolous litigation against [PH]." PH Br. (Doc. No. 61) at 19. However, PH has never clearly articulated the basis for its request. First, PH submitted a document captioned as a reply brief and a "Motion for Rule 11 Sanctions." PH Reply and Br. (Doc. No. 54). However, PH's "motion" fails to comply with the requirements of Rule 11. *See, e.g.,* Fed.R.Civ.P. 11(c)(1)(A) ("A motion for sanctions ... shall be made separately from other motions"); *id.* (requiring that the motion be served first without being filed, to permit non-moving party the opportunity to withdraw or correct the challenged allegation). In addition, apparently unwilling to follow the mandates of Rule 11, PH simultaneously "urge[d] that this Court, on its own initiative" order Woolfolk's counsel to show cause why he has not violated Rule 11(b). PH Reply and Br. (Doc. No. 54) at 1. Later, however, PH apparently abandoned any hope of invoking its own novel interpretation of Rule 11, and simply urged that I resort to this Court's inherent power to assess attorney fees against Woolfolk's counsel. PH Br. (Doc. No. 61) at 17. I shall deny PH's requests.

■ Federal courts possess inherent power to impose attorney fees as a sanction for bad faith conduct. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S.Ct. 2123, 2135, 115 L.Ed.2d 27 (1991). This power exists even if the conduct could also be sanctioned under 28 U.S.C. § 1927[27] or under Rule 11. *Id.,* 501 U.S. at 48–52, 111 S.Ct. at 2135–36. A court must, however, "exercise

---

25. Woolfolk also asserts that PH is subject to corporate liability for Duncan's allegedly discriminatory conduct. Under the corporate negligence doctrine, a "hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being *while at the hospital.* This theory of liability creates a non-delegable duty which the hospital owes directly to the patient." *Thompson v. Nason Hosp.,* 527 Pa. 330, 591 A.2d 703, 707 (1991) (emphasis added). Woolfolk's reliance on this doctrine is misplaced, however, because the record contains no evidence that any of Duncan's alleged discriminatory conduct occurred at PH. Woolfolk cites no support for his expansive "theory" that would make hospitals liable for the torts committed at a staff physician's private office. *See Pedroza v. Bryant,* 101 Wash.2d 226, 677 P.2d 166 (1984) (corporate negligence theory does not extend to persons who are injured while being treated at hospital staff member's private office); *Insinga v. LaBella,* 543 So.2d 209, 214 (Fla.1989) (same).

26. Woolfolk also seeks punitive damages from PH and HealthPASS. Because I shall grant summary judgment for PH on all claims, I shall also grant PH summary judgment on the punitive damages claim. However, because I shall deny summary judgment for HealthPASS on the Rehabilitation Act, ADA, intentional infliction of emotional distress, and negligent hiring claims, I shall deny summary judgment for HealthPASS on the punitive damages claim.

27. "Any attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C.A. § 1927 (West 1994).

caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* The court should ordinarily rely on the Rules and the statute to sanction even bad faith conduct, but if the court determines that neither the statute nor the Rules are adequate, the court may safely rely on its inherent powers. *Id.,* 501 U.S. at 50, 111 S.Ct. at 2136.

Because this Court's inherent power to impose attorney fees should be exercised with caution, and because PH has not clearly shown why Rule 11 or § 1927 are inadequate, I decline at this time PH's multifaceted invitation to impose sanctions on Woolfolk's counsel.

## IV. CONCLUSION

In summary, the following claims remain against Duncan: (1) Rehabilitation Act (Count I); (2) ADA (Count II); (3) intentional infliction of emotional distress (Count VI); (4) breach of implied contract (Count VIII); and (5) punitive damages (Count XI). Additionally, the following claims remain against HealthPASS: (1) Rehabilitation Act (Counts I and V); (2) ADA (Count II); (3) intentional infliction of emotional distress (Count VI); (4) punitive damages (Count XI); and (5) negligent hiring (Count X). No claims remain against PH.

An appropriate order follows.

### ORDER

AND NOW, this 5th day of January 1995, it is hereby ORDERED that

1. Defendants' consolidated Motions for Summary Judgment (Document Nos. 3, 5, 12, 15, 16, 17, and 48) are GRANTED IN PART AND DENIED IN PART as follows:

a) Summary Judgment for Defendant Theodore G. Duncan is GRANTED on COUNT XII;

b) Summary Judgment for Defendant Theodore G. Duncan is DENIED ON COUNTS I, II, VI, and XI;

c) Summary Judgment for Defendant Pennsylvania Hospital is GRANTED ON

COUNTS I, II, III, IV, VI, VIII, IX, XI, and XII;

d) Summary Judgment for Defendant HealthPASS is GRANTED ON COUNTS VII, VIII, and XII;

e) Summary Judgment for Defendant HealthPASS is DENIED ON COUNTS I, II, V, VI, X, and XI;

2. JUDGMENT IS ENTERED IN FAVOR OF DEFENDANT PENNSYLVANIA HOSPITAL AND AGAINST PLAINTIFF JOHN WOOLFOLK;

3. Defendant's Motion for Attorney Fees (Document No. 54) is DENIED;

4. All provisions of the Scheduling Order REMAIN IN EFFECT.